Frank M. HALPIN, District Director of Internal Revenue, et al., Appellants,

v.

The COLLIS COMPANY, an Iowa Corporation, Appellee.

No. 15670.

United States Court of Appeals Eighth Circuit.

April 29, 1957.

Karl Schmeidler, Atty. Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, and David O. Walter, Attys., Washington, D. C., Roy L. Stephenson, U. S. Atty., and Robert J. Spayde, Asst. U. S. Atty., Des Moines, Iowa, on the brief), for appellants.

Ralph U. Heninger, Davenport, Iowa (Richard M. McMahon, Davenport, Iowa, on the brief), for appellee.

Before JOHNSEN, VOGEL and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

This is an appeal by Frank M. Halpin, District Director of Internal Revenue, and George G. Jeck, former Collector of Internal Revenue, from judgment of the District Court awarding taxpayer refunds upon 1950 and 1951 excess profits tax paid. Taxpayer, The Collis Company, is an Iowa corporation engaged in manufacturing various products, including precision tools, machine parts, shelving, poultry equipment, bakery equipment, and many other items. For the years here involved taxpayer has filed income and excess profits tax returns with the District Director of Internal Revenue at Des Moines, Iowa, and has paid all tax due, including the deficiency tax demanded. Taxpayer filed appropriate claims for refund. All jurisdictional requirements have been met.

Taxpayer elected to use the average base period income method for determining its excess profits tax. The excess profits tax is designed to siphon off a portion of the unusual or excessive profits made by corporations in wartime booms, in this case, the Korean war. Excessive profits are determined, in the method followed here, by a comparison of the income of the taxable wartime years with the taxable income of the corporation in the pre-war, or "base period," years 1946–1949. The comparison is made, however, not with the corporation's actual income for the base period years, which might have been unduly low because of unusual expenses or for other reasons, but with a constructive income, termed the excess profits tax income. This latter is arrived at by starting with the corporation's actual net income, and making certain "adjustments" to correct certain abnormalities.

The adjustments here involved are for certain deductions which in fact were allowed as deductions in computing taxpayer's actual taxable income during the base period years. In now recomputing taxpayer's income during those years for excess profits tax purposes, those deductions, if they qualify as unusual within the statute, are to be disregarded or "disallowed." The effect of the disallowance of deductions for the base years is to increase the normal income for the base years for excess profits tax purposes, and thus lessen the gap between profits in the wartime years and the normal years. The result is to decrease the amount of excess profits tax due.

The taxpayer contended and the trial court found that the base period deduc-

**700**

tions involved in this appeal should be disallowed for excess profits tax purposes. Appellants contend that the deductions claimed do not fall within the statutory conditions and should not be disallowed.

This case was tried to the court without a jury. The record is largely stipulated. The parties agreed upon the issues to be determined by the court and, after the determination of such issues, computation of the amount of refund was agreed upon by counsel. The stipulated issues involved in this appeal and appellants' assertion of error on the part of the trial court in determining such issues are:

1. Camera issue. The court below erred in holding that taxpayer's camera division was a branch within the meaning of section 433(b) (18).

2. Hauk bad debt issue. The court below erred in holding that the Hauk bad debt loss was not a consequence of a change in type, manner of operation, size or condition of taxpayer's business within the meaning of section 433(b) (10).

3. Computation issue. The court below erred in holding that section 433(b) (10) is not a limitation on the amount to be disallowed under 433(b) (9).

We shall proceed to consider the errors urged by the appellants in the order above stated.

1. Camera issue. Provision is made in the Excess Profits Tax Act of 1950, as amended, for adjustment of base period losses from branch operations under certain conditions. Section 433(b) (18) and (19), Internal Revenue Code of 1939, as amended.[1] The parties have in effect stipulated that the camera loss should be disallowed for the base years for excess profits tax purposes in the event the camera unit was a branch within the meaning of section 433(b) (18). The parties agree that all other prerequisites for disallowance have been

met. Section 433(b) (18) defines the word "branch" as follows:

" * * * As used in this paragraph, the term 'branch' means a unit or subdivision of the taxpayer's business which was operated in a separate place from its other business and differed substantially from its other business with respect to character of products or services. * * *"

The appellants do not challenge the court's determination that the product of the camera unit differed substantially from any other product manufactured by the taxpayer. Consequently, the issue in this division of the opinion boils down to whether or not the camera unit was operated in a separate place from taxpayer's other business. The words "separate place" are not defined by the statute. The words are defined by Treasury Regulations 130, Section 40.333(b)–4, as follows:

"(2) *Separate location.*—A unit or subdivision of the taxpayer's business shall be considered as having been operated in a separate place or places from its other business only if there was a distinct and complete physical separation between the unit or subdivision and the taxpayer's other business."

Appellants argue, "The term 'separate place' is used as part of a definition of 'branch,' and of itself is meaningless except in that context." Appellants then urge that a branch can not be located upon the premises of the main plant, but must be geographically separated by a substantial distance from the main plant. No cases are cited to support such contention. Appellants do quote from accounting textbooks tending to indicate that branches are located at a point remote from the main establishment.

██ It is doubtless true that branches are perhaps ordinarily located at a distance from the main factory. However,

[1]. All statutory references in this opinion are to the Internal Revenue Code of 1939, as amended by the Excess Profits Tax Act of 1950 and amendments thereto, 26 U.S.C.A. Excess Profits Taxes.

we have serious doubt whether it is impossible to establish a branch on the premises. It is unnecessary here to decide such question. The statute, heretofore quoted, defines branch. Courts are bound to follow legislative definitions of terms used in statutes. It is unimportant whether the legislative definition conforms to the usual and ordinary meaning and definition of the word. W. J. Sandberg Co. v. Iowa State Board of Assessment and Review, 225 Iowa 103, 278 N.W. 643, 645, 281 N.W. 197. See also Gellman v. United States, 8 Cir., 235 F.2d 87, 91. The word "separate" is a common and well understood word. Among the definitions of the adjective "separate" contained in Webster's New International Dictionary, Second Edition, are the following:

"1.a Unconnected; not united or associated; distinct;—said of things that have not been connected.

"b Divided from another or others; disjoined; disconnected; severed;—said of things once connected."

In Baetjer v. United States, 1 Cir., 143 F.2d 391, a land condemnation case, the principal issue was what constituted a single tract of land as distinguished from separate tracts. Two noncontiguous parcels of land were involved. The court held that it was a question of fact whether the land involved consisted of a single unit or separate units. The court stated at (page 395), "separation still remains an evidentiary, not an operative fact."

There is nothing either in the statute or in the regulations heretofore set out which requires that a branch be separated from the main plant by a substantial geographical distance. We are satisfied that the issue of whether the camera unit was operated at a place separate from taxpayer's other business is a question of fact. We look briefly to the facts bearing upon this issue.

The camera unit was located 600 feet from the general offices. The building used by the camera unit had been partitioned off from the rest of the plant in 1943 in a manner which met security requirements of the Ordnance Department. At that time taxpayer was producing artillery fuses for the Government, which operation had been discontinued prior to the opening of the camera unit. The camera unit, among other things, had its own separate entrance and could be entered only through such entrance. It had its own timeclock, its own machinery, its separate tool crib, its separate washroom, its own separate employees, and its own office. There was no interchange of work between the camera unit and the rest of the plant. Separate records were maintained for the camera unit.

A consideration of all of the evidence convinces us that the trial court's finding that the camera unit was operated at a separate place and was physically separated from all of the taxpayer's other manufacturing facilities is fully supported. The court did not err in concluding that the camera unit was a branch within the meaning of section 433(b) (18) and (19), and that the losses incurred in the camera branch should be disallowed for excess profits tax purposes.

2. Hauk bad debt issue. The stipulation as to the Hauk bad debt issue is:

"As to the B. Riley Hauk bad debt issue, it is incumbent upon the Plaintiff to prove that the loss was in fact a bad debt and if a bad debt, was not 'a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer', within the meaning of Section 433 (b) (10) (C) (ii), all other prerequisites of Section 433(b) (9) and (10) as to qualification for adjustment having been met."

Section 433(b) (10) (C), so far as material, provides:

"(C) Deductions of any class shall not be disallowed under such paragraph unless the taxpayer established that the increase in such deductions—

702

\* \* \* \* \* \*

"(ii) is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer."

The trial court found the Hauk loss to be a bad debt loss. This finding of the court is not disputed by appellants.

Appellants do challenge the court's finding that the taxpayer's entry into the heater business was not a change in the type, manner of operation, size, or condition of the business engaged in by the taxpayer. We believe this issue to be one of fact and are of the opinion that the court's finding of fact is supported by substantial evidence.

The record discloses that in 1947 taxpayer received an order for 600 water heaters from Hauk. The taxpayer had not produced water heaters before, but had manufactured a wide variety of products, including an extensive amount of wire specialties. The heater consisted of an outer shell of metal, insulation of glass wool, and an inner core of porcelain wrapped with wire. The construction of the heating unit involved wrapping wire around the core. The heaters were made in Building No. 4 where wire specialties were manufactured. The water heaters were made on the regular assembly line by employees using existing tools and machinery. In evidence are exhibits showing the wide variety of items manufactured by the taxpayer. There is no evidence whatever which would indicate that the manufacture of the water heaters required any extensive experimentation costs, or that any new machinery or equipment was required in their manufacture, nor is there any showing that any new engineers or skilled workmen were needed to produce the heaters. There is also an absence of any proof of any extensive advertising campaign or other substantial expense incurred in connection with the water heater project. The taxpayer sold some of the heaters in process, some material and tools, along with a boat to Hauk. The undisputed bad debt loss amounting to $30,831 arose

out of this sale. The taxpayer's sales for 1947 were approximately $1,300,000. The trial court had before it comparative income statistics of the taxpayer for the years from 1944 to 1953.

Our conclusion that the trial court committed no error in determining that there has been no substantial change in the type, manner of operation, size, or condition of the business engaged in by the taxpayer by reason of the water heater operation is dispositive of the bad debt issue. If there has been no change in the taxpayer's business within the meaning of section 433(b) (10) (C) (ii), the issue of whether the bad debt was a consequence of the change can not arise.

3. Computation issue. The computation issue, as stipulated, is:

"Whether or not the restrictions and limitations respecting the disallowance of abnormal deductions, all as imposed by Section 433(b) (10) of the Code (the so-called 5% Rule), are to be applied exclusively and without regard to the 115% limitation as required by Section 433(b) (9) (as opposed to application of the 5% Rule on the amount of such excess disallowance computed under the 115%· Rule)."

The determination of this issue requires a construction of section 433(b) (9) and (10) which, so far as here material, reads:

"(9) *Judgments, intangible drilling and development costs, casualty losses, and other abnormal deductions.* If, for any taxable year or years within, or beginning or ending within, the base period, any class of deductions for the taxable year exceeded 115 per centum of the average amount of deductions of such class for the four previous taxable years (not including deductions arising from the same extraordinary event which gave rise to the deduction for the taxable year), the deductions of such class shall, subject to the rules provided in para-

graph (10), be disallowed in an amount equal to such excess. * *

[Classes of Deductions are set out]

"(10) *Rules for application of paragraph (9)*. For the purposes of paragraph (9) * * *

"(B) Deductions of any class for any taxable year shall not be disallowed under such paragraphs unless the amount of deductions of such class *to be disallowed* for such year exceeds 5 per centum of the average excess profits net income for the taxable years within, or beginning or ending within, the base period, computed without the disallowance of any class of deductions under such paragraph. * * *" (Emphasis ours.)

No cases have been cited by counsel or found by us passing upon the issue here under consideration. The trial court upheld the taxpayer's contention, stating:

"* * * the court has had trouble understanding this statute. But the way I read it, and the only way I can read it to eliminate conflict and contradiction between the provisions of subparagraph 9 and those in subparagraph 10 of the statute, and to make any sense of it, is as follows: I start with subparagraph (b) of subparagraph 10 of the section. It says that 'Deductions of any class for any taxable year shall not be disallowed under such paragraph (meaning paragraph 9) unless the amount of deductions of such class to be allowed for such year exceeds five percentum of the average excess profit net income for the taxable years within, or beginning or ending within, the base period, computed without the disallowance of any class of deductions under such paragraph.'

"This language defines and presents the conditions and facts essential to disallowance; and when and if met, we must go to the language in subparagraph 9 to determine the allowable amount of those deductions * * *."

The taxpayer bases its argument for affirmance principally upon the reasoning of the trial court just set out. It further contends that the only way the construction sought by the appellants can be obtained would be to supply the word "excess" before the word "deductions" in subsection (10), and that to do so would involve prohibited judicial legislation enlarging the statute.

The appellants contend the trial court's construction is erroneous, first, because it ignores the statutory pattern of construing (9) before (10), and disregards the fact that (10) opens with the words "Rules for application of paragraph (9)." Appellants assert that (10) is obviously intended as a limitation upon (9), as (10) contains a series of limitations including those discussed in section 2 of this opinion. As a second reason appellants urge that the trial court's interpretation ignores the specific language of the statute.

We believe the appellants' contentions, above set out, to be sound. Sections of statutes are ordinarily considered in the order in which they appear. Congress's intention that the usual pattern should be followed is manifested by commencing (10) with "Rules for application of paragraph (9)." Paragraph (10) sets out a number of limitations upon the applicability of (9), including the one here under consideration.

The words "to be disallowed" in paragraph (10), italicized by us, modify the words "amount of deductions of such class." If such were not the case, there would be no occasion for using the modifying words. To adopt the taxpayer's construction we would have to ignore the words "to be disallowed", or distort their meaning. Under paragraph (9) the deductions of the class to be disallowed are those exceeding 115 per cent of the average deductions of such class for the base years. Paragraph (9) contains an express provision that the deductions therein provided "shall, subject to the rules provided in paragraph (10),

be disallowed in an amount equal to such excess."

Even if paragraph (10) is considered first, when we come to the words "amount of deductions of such class to be disallowed," we must look to paragraph (9) to determine the amount to be disallowed. Paragraph (9) provides that the amount to be disallowed is the excess above 115 per cent.

Section 40.433(b)–3 of Treasury Regulations 130, provides:

"Sec. 40.433(b)–3. Abnormal deductions in base period.—

\* \* \* \* \* \*

"(c) *Additional requirements.* Even though a taxpayer has a class of deduction for a taxable year which meets the requirement that it exceed 115 percent of the average of such class of deductions for the taxable years used in determining average deductions, the taxpayer will not be entitled to compute excess profits net income by adding such excess to normal-tax net income tax unless the following additional requirements are also met:

"(1) The amount of such excess must exceed 5 percent of the average excess profits net income for the taxable years which are within, which begin within, and which end within the base period (computed without the disallowance of any such class deductions). \* \* \*"

These regulations were adopted March 13, 1951. See 26 C.F.R. 1128.

■ The foregoing regulations appears to us to be entirely reasonable and consistent with the statutes upon which it is based. Treasury regulations are made pursuant to express statutory authority. They constitute the contemporaneous construction by those charged with the administration of the revenue laws and are entitled to careful consideration. The regulations should be sustained unless unreasonable or inconsistent with the statutes upon which they are based. Commissioner of Internal Revenue v. South Texas Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831; Fawcus Machine Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397; Hart-Bartlett-Sturtevant Grain Co. v. Commissioner, 8 Cir., 182 F.2d 153, 158. Various texts support the interpretation of paragraphs 433(b) (9) and (10) made by the regulations. In Mertens Law of Federal Income Taxation, Vol. 7A, paragraph 42.93, page 397, it is stated:

"*The 5% Rule.* The amount of such excess must be more than 5% of the average excess profits net income for the taxable years \* \*.

"If the excess over 115% does not also exceed this 5% amount, the excess over 115% is not disallowed. \* \* \*"

See also 2 Montgomery Federal Taxation, page 418.

The taxpayer urges that the legislative history of the statutes under consideration supports its contention. We find nothing in the legislative history that affords any substantial aid in the interpretation of the involved statutes.

We conclude that the statutes here involved are properly interpreted in the regulations hereinabove set out, and that, before the taxpayer is entitled to have any abnormal deduction disallowed, the excess over 115 per cent computed under paragraph (9) must exceed 5 per cent of the average excess profits net income for the base period. It follows that the judgment of the District Court on this division of the appeal must be reversed.

The judgment of the District Court is affirmed as to Division 1, Camera issue, and Division 2, Hauk bad debt issue, and is reversed as to Division 3, Computation issue. This case is remanded to the District Court for further proceedings not inconsistent with the views expressed in this opinion.