**NORTHERN NATURAL GAS COMPANY, Plaintiff**

v.

**George W. O'MALLEY, Defendant.**

**NORTHERN NATURAL GAS COMPANY, Plaintiff**

v.

**James L. McCRORY, Defendant.**

**Civ. Nos. 49-55, 50-55.**

United States District Court
D. Nebraska.
March 23, 1959.

James W. R. Brown, Dale Te Kolste, Stephen M. Sawtell, Lawrence I. Shaw, and F. Vinson Roach, Omaha, Neb., for plaintiff.

William C. Spire, U. S. Atty., Robert H. Berkshire, Asst. U. S. Atty., Omaha, Neb., and Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lester L. Gibson, Deane E. McCormick, Jr., Attys., Dept. of Justice, Washington, D. C., for defendants.

ROBINSON, Chief Judge.

These actions are for the recovery of federal income taxes claimed to have been erroneously assessed and wrongfully collected. The jurisdictional facts, accepted without controversy, require no statement at this time. Section 1340, Title 28 U.S.C. clearly supports the proceedings. While it does not concern the merits, counsel have pointed out that the cases involve a substantial amount of money, totaling $90,099.28 apart from interest, for the taxable period from 1946 through 1951. The cases were consolidated for trial as they raise, in broad terms, a single issue: whether the taxpayer is entitled to a depreciation allowance on its investments in transmission pipeline rights-of-way during the period in question. So far as our research has extended, we have found no case which authoritatively decides the question, prompting us to set out all the facts available in the course analyzing the essential issues and making a final determination. This approach will prove helpful in view of the nature of the arguments advanced by the respective litigants.

The taxpayer is the owner and operator of a natural gas withdrawing and gathering system connected with the Texas Panhandle, the Hugoton, the Otis, and the Pawnee Rock gas fields, and a transmission and transportation system starting at Skellytown, Texas, and extending in a northeasterly direction to Palmyra, Nebraska, where it divided into two lines, one going to a point near Des Moines, Iowa, and then to Minneapolis and St. Paul, Minnesota, the other going to Sioux City, Iowa, and then to the twin cities.

The taxpayer has expended large sums to obtain the easements which permit it

178

to construct and maintain these transmission lines. The easements specify that they will terminate when the pipelines are no longer maintained on the real estate.

Asserting that its easements will expire as soon as it fails to maintain the transmission lines, the taxpayer submits that it is entitled to depreciate the transmission line right-of-way costs at the same rate as the transmission line costs (which are being amortized at the rate of 3½%). This rate is proposed as reasonable, having been based upon what the taxpayer considers to be the relevant facts pertaining to the life of the transmission lines and the natural gas reserves owned or controlled by it. Should our inquiry be limited to a consideration of the reasonableness of the rate of depreciation, this Court would not hesitate to say that the taxpayer has gone a long way towards establishing its case.

■ The respective District Directors of Internal Revenue, at the direction of the Commissioner, disallowed the depreciation on the transmission line rights-of-way for the reason that they had no ascertainable life. In other words, the investments were not considered subject to depreciation. These actions followed. In order for it to prevail, the taxpayer must not only show the depreciation it claims a right to is reasonable but the District Directors' determination that no right to depreciation exists is erroneous. We approach the taxpayer's case with this understanding.

Section 23(l) I.R.C.1939, 26 U.S.C.A. § 23(l), provides that "in computing net income there shall be allowed as deductions * * * a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) of property used in the trade or business * * *". The taxpayer reasons that in view of the mandatory nature of the provision the question before the Court is limited to whether the property is undergoing exhaustion. If it is, in the taxpayer's judgment a deduction for depreciation must be allowed. Upon

this premise, we need only ascertain whether the proposed rate of depreciation for the right-of-way cost is reasonable. Directing our attention to the limited nature of the supplies of natural gas reserves available, the taxpayer maintains that the useful life of its easements must be measured in terms of the estimated life of its known reserves. In this connection, should circumstances enlarge the availability of such supplies, at most this should affect the rate of depreciation taken, not the right to claim it. From this, the taxpayer concludes that its assets are undergoing exhaustion in compliance with Section 23(l) of the Code, entitling it to a depreciation allowance.

This analysis presupposes one important factor, that the rights-of-way in question are depreciable. For the assets to be depreciable it is not enough that they merely undergo exhaustion; they must also be the proper subject of depreciation. This is the first issue to be decided. What we are considering is an intangible. Rights-of-way have no useful life or period of value which can be independently ascertained. And by their provisions, these particular rights-of-way continue in effect so long as the transmission pipelines are maintained. However, the rules ordinarily permitting an allowance for depreciation (presuming an exhaustion is occurring) may be irrelevant in view of the character of the asset which altogether removes it from the category of depreciable assets.

Any allowance must be reconciled with the appropriate treasury regulation promulgated by the Commissioner of Internal Revenue. In this instance, Section 29.23(l)–3, Treasury Regulation 111, states the controlling considerations:

"Intangibles, the *use* of which in the trade of business or in the production of income is *definitely limited in duration,* may be the subject of a depreciable allowance. Examples are patents and copyrights, licenses,

and franchises. Intangibles, the use of which in the business or trade or in the production of income is not so limited, will not usually be a proper subject of an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of *value* in the business or in the production of income *for only a limited period*, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance * * *". (Italics added.)

■ The regulation is entitled to careful consideration. It is a familiar and accepted rule that, as it constitutes a contemporaneous construction by those charged with the administration of the revenue statutes, it must be sustained unless unreasonable and plainly inconsistent with the statutes. C. I. R. v. South Texas Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831; Halpin v. Collis Company, 8 Cir., 243 F.2d 698, 704.

■ We cannot say that the regulation runs afoul of the mandates of the statute. It certainly is in harmony with the concept of depreciation and it takes into account the essential characteristics of intangibles. The regulation establishes reasonable criteria by which the assets, for tax allowance purposes, may be determined as depreciable. In this sense, while a distinction between intangibles and other kinds of assets is undoubtedly recognized, a double standard is not thereby drawn. The distinction is consistent with, and follows, the nature of the assets involved.

As the regulation satisfies the accepted tests, it cannot be overruled or dismissed as a mere nullity. We are governed accordingly. The first issue encountered, as restated in the language of the regulation, is whether the use of the easements is definitely limited in duration or, if not, whether the easements are known to be of value in the business for only a limited period, the length of which can be estimated from experience with reasonable certainty. In either

case, if this were so, the asset would by definition be susceptible of measurement and therefore subject to depreciation.

■ The point can hardly be overemphasized. At this point the case is not one in which the taxpayer has a right to a deduction, but finds itself being opposed by the Commissioner (or, through him, the District Directors) on the ground that it cannot establish exactly how much the deduction ought to be. Once it is ascertained that the useful life of the assets is susceptible of measurement, time-wise, it is true that the amount (or rate) of depreciation proposed to be taken need only be shown as reasonable. There is no requirement that it must be ascertained to a certainty. The question is settled by Section 29.23(l)–5, Treasury Regulation 111, which concerns the amount of depreciation to be taken on depreciable property. We find here that the proposed rate need only be "reasonable", which is the equivalent of saying that it be determined upon the conditions known to exist at the end of the period for which the return is made.

The matter of existing uncertainties which the Commissioner first raises does not concern rates; it is whether the assets can fairly be said to be susceptible of any measurement for a depreciation allowance. Stated otherwise, the rule contained in Section 23(l) of the Code is that, in all kinds of property which are by law depreciable, a reasonable deduction allowance shall be given in computing net income for each year. In view of the uncertainties which are raised, the Commissioner denies that the intangible assets are by law depreciable.

■■ To sharpen the issue, we may say that an intangible asset is by law depreciable when the period over which its full exhaustion will occur is definitely limited, permitting partial exhaustion to be ascertained. But when that time is unsusceptible of measurement, an allowance for depreciation is inappropriate as lacking a justifiable basis. The conclusion follows: it

is not enough that the taxpayer show property to be undergoing exhaustion as a basis for claiming a depreciation allowance. The taxpayer must show as well that it is undergoing exhaustion in a definitely limited (i. e., necessarily ascertainable) period of time. The time in which depreciation is occurring, rather than the fact that it is occurring, becomes of crucial importance in the case.

Approaching the case from this perspective, we understand the taxpayer's contention that the useful life of its easements is determinable was principally derived from the following consideration: the easements, existing only for the period during which the taxpayer can maintain its transmission pipelines, for all practical purposes must be treated as being limited in duration to the period of time that its gas reserves are adequate to support the profitable operation of the lines. An optimum figure of 25 years has been computed by the taxpayer as a reasonable estimate of the life of its gas reserves for such an operation. In line with the practices of the gas industry, the reserves considered in computing that estimate are the reserves owned or controlled by the taxpayer at the end of each of the taxable years. These proven reserves, as they are called, are the only reserves upon which the taxpayer claims it can rely for they are the only reserves which they have.

The Commissioner differs with the taxpayer at this point. While recognizing that by their specific terms the easements are limited in duration to the period during which the taxpayer maintains its transmission pipelines, he contends that this limitation is nevertheless indefinite. The duration is not shown by the period of time which the taxpayer has established that its proven gas reserves are adequate to support the profitable operation of the transmission lines. The Commissioner contends, in the first place, that these known reserves (as defined by the taxpayer) are too restrictive in that they fail to take into account several important factors but, beyond that,

the known reserves are not the only elements to consider in attempting to ascertain whether the useful life of the easements has definite limits. He does not reject what is said to be a minimal basis of computations as invalid for all purposes, but maintains that it is inadequate for the purpose of determining whether the rights-of-way are undergoing exhaustion susceptible of measurement. The taxpayer has the burden of showing therefore, that the basis it has relied upon, not only indicates that the asset is undergoing exhaustion, but also establishes a fixed time in which that exhaustion will occur.

We now examine the evidence the taxpayer has offered; it remains to be seen whether that evidence is sufficiently comprehensive as to satisfy the standards by which it will be tested. This calls for a general discussion, by the way of an appropriate backdrop, of the taxpayer's operation and its role in the industry.

Natural gas is an irreplaceable natural resource. It is recognized that the production of natural gas must result in its depletion and eventually in the exhaustion of the supply. The point is underscored by the 1948 report of the National Gas Investigation, Federal Power Commission. "It is an accepted fact that natual gas is a wasting asset and that for every pool discovered, there is one less to be found."

The principal gas fields in the United States during the years in suit were the Texas Panhandle field in the northern part of Texas, the Hugoton field in the northern portion of Texas extending into the Panhandle of Oklahoma and the northwestern portion of Kansas, the Monroe field of northern Louisiana, and the Carthage field in eastern Texas. Other producing areas include the considerably depleted Appalachian area, the San Juan Basin in northwestern New Mexico, and certain areas in northern Montana and south-central California. After the termination of the Second World War, substantial natural gas developments occurred in the Gulf Coast

areas of Texas, Louisiana and Mississippi.

The taxpayer was incorporated on April 25, 1930, and has been engaged since that time in the business of producing and purchasing natural gas, transporting it to the northern plains section of the country for sale. The gas is moved from its source to various points of consumption by transmission, or long distance, pipelines. In the first year of its operation the taxpayer constructed a transmission line from northern Kansas to southeastern Nebraska. In 1931 the line was extended to Omaha, Nebraska, Sioux City, Iowa, and Sioux Falls, South Dakota. In 1933 the line reached Minneapolis and St. Paul, Minnesota. During the early years, the taxpayer used the pipeline of an affiliated company south of Clifton, Kansas, to procure and transmit gas northward to its newly constructed lines.

During the taxable years 1946 through 1951, the taxpayer's system was connected with and received all of its gas from four fields, the Texas Panhandle, the Hugoton, the Otis, and the Pawnee Rock fields, although the last was not available to the taxpayer until 1947. It acquires its gas either by purchase or through its own exploration on leases owned by it. Over the years, approximately 85% to 88% of the taxpayer's gas was purchased under contract, while the remaining 15% to 12% was produced from property on lease.

The pipelines are classified as gathering lines and transmission lines. The gathering lines originate from the sources of the gas, mainly the particular wells in the fields where it is located. These lines have the function, so to speak, of collecting the gas, after which it is compressed and piped into the transmission, or large-diametered, long distance lines the function of which is to transport the gas from the points of collection to be markets, or points of consumption. In the present case, we are only concerned with the easements underlying the transmission lines, but the distinction between the types will become important as the case develops.

The transmission lines extend from Skellytown in the Texas Panhandle field to Palmyra, Nebraska, where they separate into two branches, one passing near Des Moines, Iowa, the other through Sioux City, Iowa, both connecting ultimately with the twin cities of Minneapolis and St. Paul, Minnesota. The taxpayer's market area thus lies generally north of the Clifton, Kansas, station and covers parts of the states of Nebraska, Iowa, South Dakota, and all of Minnesota. It serves, among the larger cities, Omaha, Des Moines, Sioux City, Sioux Falls, Owatonna, Rochester, Minneapolis, and St. Paul.

These transmission lines were constructed by virtue of written easements upon land owned in fee by others. The agreements provide that the rights therein granted to the taxpayer shall exist " * * * so long as such pipelines, and appurtenances thereto, shall be maintained * * * ". As the taxpayer increased its capacity, it was required to expand its facilities, which usually was accomplished by laying additional pipelines paralleling the original pipelines. These additional lines, called loop lines, lie on the original rights-of-way. The placing of loop lines on the old rights-of-way had a definite economic advantage. Whenever a loop line was added, a new roddage fee was paid to the grantor of the easement or his successor in interest.

The different categories of expenditures capitalized as rights-of-way costs are roddage fees; easements and grants; recording, notary, and abstract fees; legal and court costs; options; railroad and highway permits; labor, expense accounts, and auto expenses; telephone and stationery expenses; outside services securing the rights-of-way; and overhead. The taxpayer had incurred such costs by the end of 1951 in a total accumulated amount of $1,509,272.04.

This represented an increase of its investment in such assets of approximately $689,000 during the years 1946 through 1951. And testimony was offered by the taxpayer to the effect that at present the costs are in excess of $2,500,000.

As a regular part of its business activities, the taxpayer made an annual estimate of its natural gas reserves. The methods for computing such reserves were elaborately described. Employing one or more of the methods, the taxpayer determined what were the natural gas reserves owned or controlled by it in the fields to which it had access. As summarized, the figures are as follows:

| | Millions of Cubic Feet | |
| --- | --- | --- |
| Year Ended December 31 | 16.4 Pressure Base | 14.73 Pressure Base |
| 1946 | 3,322,854 | 3,699,580 |
| 1947 | 4,074,683 | 4,536,647 |
| 1948 | 3,959,135 | 4,407,998 |
| 1949 | 5,415,232 | 6,029,179 |
| 1950 | 5,556,979 | 6,186,996 |
| 1951 | 5,934,429 | 6,607,240 |

It will be understood that when the taxpayer says that it had a reserve of 5,934,429 million cubic feet at 16.4 pressure base at the end of 1951, this means a known gas reserve. This figure is generally used (and ordinarily required) by everyone dealing with the natural gas industry. But to digress slightly, the point should be made that while it is a universally accepted and understood figure it is not the only figure which interests the taxpayer. A cursory examination of its annual statements shows that it is continuously evaluating the availability of additional reserves, and on the basis of its prospects for obtaining these reserves the taxpayer justified its program for expansion for its plan and operation. To anticipate the arguments, it may be appropriate to observe that whether it was reasonable for the taxpayer to confine itself to a consideration of the proven reserves alone in this case will become a pivotal issue.

A statement of expanding known reserves (through the discovery of new gas fields or by other means) foreshadows certain complicated but well defined problems. The taxpayer cites, for instance, that during the period of 1946 through 1951 it was faced with active competition for gas supplies from at least eight other companies in the fields to which its own system was connected. Furthermore, such competition for natural gas is affected by the fact that 68% of the gas produced is consumed in the states in which it is found. But there is no need to explore here all of the considerations affecting the taxpayer's calculation of reserves.

As the period in question opened, there was a tremendous increase in the demand for natural gas. At the outset—and for a considerable portion of the time thereafter—there was an incapability to furnish the additional gas needed. Only as the taxpayer made increases in its system capacity were the unsatisfied demands supplied with gas. The manifold causes for the demand, and the emergency conditions created by it are interesting but not germane; it is desirable only to say that the pent-up demand necessitated the taxpayer's increasing the capacity of its system to serve these additional customers. The increases, in contrast with the taxpayer's prior operating experience, were sizeable in nature. It is reported that the total input capacity of the taxpayer's system at the end of each of the taxable years, on the basis of

the system then in service or under actual construction, was:

| Year | Cubic Feet Per Day |
|------|-------------------|
| 1946 | 371,100,000 |
| 1947 | 440,450,000 |
| 1948 | 493,625,000 |
| 1949 | 555,250,000 |
| 1950 | 692,850,000 |
| 1951 | 772,565,000 |

The figure of 772,565,000 cubic feet per day as shown for 1951 does not include a capacity increase of an additional 150 million cubic feet per day for which the taxpayer had, early in the year, filed an application with the Federal Power Commission to secure.

At the end of each year, the taxpayer found it necessary to anticipate that its system would, in the ensuing years, deliver in excess of 90% of its capacity. As it is commonly called, the taxpayer's system had a load factor in excess of 90%.

The central concept in the taxpayer's case is the reserve life index. The taxpayer uses it as a yardstick for estimating the life of the gas reserves. The indicated life of the reserves at the end of each year can be determined by dividing the proven reserves at the end of a year by the production of gas during that year. The reserve life index of the taxpayer's reserves based on actual production during the years involved is shown as follows:

| Year | Production, 16.4 Pressure, in billions of cubic feet | Reserves, 16.4 Pressure, billions of cubic feet | Reserve Life Index |
|------|------|------|------|
| 1946 | 88.5 | 3,322.8 | 37.5 |
| 1947 | 107.3 | 4,074.6 | 37.9 |
| 1948 | 128.3 | 3,959.1 | 30.8 |
| 1949 | 144.5 | 5,415.2 | 37.4 |
| 1950 | 164.3 | 5,556.9 | 30.1 |
| 1951 | 203.8 | 5,934.4 | 29.1 |

The taxpayer's reserve life figures are somewhat lower, which can be accounted for by its having used as a divisor the estimated amount of system requirements for the year. This, in turn, is based on an estimated load factor of complete capacity of the transmission facilities. On this basis the indicated life of the taxpayer's gas reserves at the end of each year would be:

| Year | Life Index |
|------|-----------|
| 1946 | 29.5 |
| 1947 | 30.5 |
| 1948 | 26.4 |
| 1949 | 32.2 |
| 1950 | 26.4 |
| 1951 | 25.3 |

Whether the divisor is an estimated amount of system requirements or the actual production figures, it cannot be overlooked that the quotient obtained is merely a theoretical number. It becomes apparent that the production or withdrawal rate of a particular year cannot be maintained due to pressure losses. Because of a decline in pressure, the taxpayer states that its gas reserves at the end of the taxable years were sufficient to meet its peak day requirements for a period of 14 to 15 years.

There are other ramifications of pressure losses due to withdrawal. The decline in pressure increases the cost of operation. As maintenance of a given rate of production and transmission becomes more expensive, the competition for local uses will become greater until, it is suggested, a point is reached at which it would no longer be economical to transport gas long distances. To illus-

trate how these factors affect one another, we need only consider whether there is any reason to assume a fixed rate of production for these years. We have seen that the taxpayer was continuously faced during these years with a demand necessitating an expansion of its capacity. In fact, because of a slower expansion in the first years involved due to the unavailability of steel supplies, the withdrawals were substantially less than what was reasonable to expect; consequently, the life index was correspondingly larger. As the pent-up demand was being satisfied, however, more and more of the gas was withdrawn from its reservoirs. Barring the intervention of other factors, the time would rapidly come when the taxpayer could expect that the problem of resulting decline in pressure, drop in withdrawal rate, and rise in cost of operation of the transmission system would arise.

The taxpayer also suggests that the securing of additional reserves, such as the Permain Basin in 1951, to satisfy the increasing demands may actually produce an adverse effect on its reserve life index. An increase in the volume of sales, made possible by the acquisition of additional gas supplies, requires even greater production and thus only serves to shorten the life of the total reserves by that process. Acquisition, in other words, never quite offsets, but merely keeps pace with or lags behind, expanding production.

These factors appear to indicate that the proven reserves ought not be considered available for long distance transmission to the extent that the reserve life tables suggest. The taxpayer estimated that, all things considered, its proven reserves at the end of each of the taxable years were adequate only for a period somewhere between 14 or 15 and 25 years.

The taxpayer also observes that the total natural gas reserves of the country, expressed in terms of proven reserves and production during each of the taxable years, declined from 32.5 years' supply at the end of 1946 to 24.3 years' supply at the end of 1951, as the following chart illustrates:

Millions of Cubic Feet
(14.65 PSI Pressure Base)

| Year | Estimated Proved Reserves as of End of Year | Net Production During Year | Reserve Life Index Col. 2 Div. by Col. 3 |
|---|---|---|---|
| 1946 | 160,575,901 | 4,942,617 | 32.5 |
| 1947 | 165,926,914 | 5,629,811 | 29.5 |
| 1948 | 173,869,340 | 6,007,628 | 28.9 |
| 1949 | 180,381,344 | 6,245,041 | 28.9 |
| 1950 | 185,592,699 | 6,892,678 | 26.9 |
| 1951 | 193,811,500 | 7,966,941 | 24.3 |

Other variations can be played on the theme of reserve life index. Another measure of the indicated life of reserves can be had by relating the proven reserves at the end of each year to the production scheduled for the following year. This, in fact, would more intelligently account for the rising production curve which the industry is experiencing. By dividing the proven reserves in this manner we would obtain a quotient which is less than is shown above. For example, if the reserves at the end of 1950 were divided by the production during 1951, the life index at the end of 1950 would be 23.2 years rather than 26.9.

The facts thus far related furnish some idea of the circumstances which may lie beyond, as well as within, the control of the taxpayer. The taxpayer's case rests on the fact that the continued existence of its rights-of-way, by their terms, depends upon the continued operation of the transmission lines. Continued operation of the lines in turn depends upon the taxpayer having an adequate supply of natural gas to permit a profitable business. Yet natural gas is an exhausting natural resource. Therefore, to determine whether the useful life of its rights-of-way is limited and therefore ascertainable, the taxpayer resorts to the economics (which, we are told, are the realities) of the situation. In simple words, the taxpayer finds itself unable to gauge the useful life of its easements other than in terms of its estimate of the life of the gas reserves owned or controlled at the end of each taxable year. The reason is that the availability (or supply) of natural gas cannot, for operational purposes, be relied upon beyond that point. As far as the taxpayer has been reasonably able to ascertain this estimate is an optimum of 25 years. Therefore, in the taxpayer's judgment, it follows that the useful life of the easements is limited to this period. Once this is ascertained, the taxpayer contends that any extensions of the period for one or another reason may warrant a revision in the rate of depreciation, but would not deprive it of its right to the allowance.

There is no question, from what has been stated, that the taxpayer's rights-of-way are, in some manner, undergoing exhaustion. The point is whether that exhaustion is susceptible of measurement. If it cannot be measured, the taxpayer's reasoning has no merit. We have previously said that the rights-of-way are not undergoing exhaustion for purposes of depreciation unless one can foresee a fixed time, as distinct from a condition, when the asset will be useless or valueless. In other words, accepting that the exhaustion of natural gas reserves is a condition upon which the useful life or value of the rights-of-way would cease, has the taxpayer shown with sufficient definiteness when this condition will occur? This brings us directly to the question whether by dividing inventory by production (or with any other formula) that time is shown.

By way of answering, the Commissioner first considers what is taken as inventory, or reserves, by the taxpayer. He finds that the methods employed in determining the gas reserves in the fields to which the taxpayer's lines are connected exclude reference to over 28,000 acres considered unproven. Moreover, he finds that there is no estimate with regard to over 128,000 prospective acres held by the taxpayer. No reserve, therefore, was estimated for approximately 25% of the acreage held by the taxpayer either under lease or committee by contract.

Furthermore, the contracts held by the taxpayer for the purchase of gas frequently require the purchase of a minimum amount. Calculations of reserves under these contracts are made by multiplying the amount of purchase within a year by the number of years under contract. However, the Commissioner points out the contracts are always subject to further negotiation regarding price and the amount purchasable.

Another consideration to be taken into account with regard to the amount of known gas reserves of the taxpayer, the Commissioner points out, is that the taxpayer enters into its purchase agreements and develops its leases only for sufficient gas to supply its annual market for about 20 years. In other words, it has a policy of maintaining reserves sufficient to produce yearly needs on a projected basis, and a reserve of that size is considered adequate for the purpose. Thus the reserve which the taxpayer owns or controls is constantly being maintained within limits which are imposed by economic and operational considerations.

For example, the taxpayer's contract with Phillips Petroleum Company has a clause requiring the taxpayer to take a minimum amount of gas per day. Confronted with such clauses, the taxpayer must determine what is the economically feasible point at which the total of the minimum daily purchases, or the minimum daily take, provided for in all the contracts owned equals the total daily sales. Such computations must also anticipate the expanding consumer demands for gas and the pressures of increased competition, as well as respect the operational and economic limitations.

The taxpayer is caught up by an endless chain of events, acquiring additional markets and entering into additional purchase contracts, from which it has no way of escaping. In the final analysis, the Commissioner is obliged to consider the totality of factors which are deemed to be decisive in accounting for inventory. The extent of reserves owned or controlled at any one time may be influenced by consumer demand, but the significance of the amount lies in the fact that the taxpayer's reserves are limited to what is fiscally, if not functionally, possible to acquire.

This thinking may be pursued further. The quantity of gas reserves acquired appears to be determined without regard to the ultimate supply of gas or even the present availability of it. A reserve is maintained as would assure a steady, substantial supply at the end of each year. The taxpayer's needs for gas therefore appear in a different light to the Commissioner than they do to the taxpayer. The needs establish the amount of reserves the taxpayer must acquire and maintain rather than are themselves determined by the availability of potential supplies. Any limitation on the needs is set by market demand, not by the natural resource. In this connection, the Commissioner cites the report of the Natural Gas investigation to show that reserve estimates, as absolute figures in large dimensions, have little significance

except as they are interpreted in relation to the volume of annual production.

For such reasons, the reserve life index is treated by the Commissioner as an unrealistic factor by which to determine the life of the natural gas industry or the taxpayer. It provides a shorthand expression for reserves but it may lead to an erroneous conclusion regarding their estimated life. Therefore, both parties agree, for different reasons however, that it is a relative and not an absolute figure.

In reviewing the qualifications which must be attached to any statement of proven reserves, the Commissioner also considers the matter of the growth of the reserves. At an earlier point the reserve life index of the natural gas reserves in the United States was set out. It may be recalled that, for the years in suit, the figures steadily declined. However, the Commissioner comments that the downward progression resulted from the abnormal increase in the demand for natural gas and the expansion of gas facilities following the Second World War, while additions to reserves continued upwards in a more normal rate. One reason for this tendency was that, while acquisition is geared to the need for gas, the development of additional reserves is controlled by monetary considerations.

The report of the Natural Gas investigation, cited before, relates that periodic alarms have been raised that our resources or gas will soon be exhausted. However, since the beginning the industry has upset predictions of early exhaustion as well as succeeded in meeting the mounting demands. The Commissioner observes that the gas reserves of the country and the taxpayer have increased during every year in issue, except the latter's during 1948. What is more, we find the growth of reserves has been at a more rapid rate than production.

The following chart illustrates that the proven gas reserves of the taxpayer during the years 1946 to 1951 have almost doubled, while the country's reserves increased less than 25%:

Millions of Cubic Feet

| Year | At 14.65 pressure United States | At 14.73 pressure Taxpayer |
|---|---|---|
| 1950 | 193,811,500 | 6,607,240 |
| 1946 | 160,575,901 | 3,699,580 |

At the end of 1956 (which represents another 5 year period) the taxpayer again practically doubled its reserves.

During the years in suit, the states showing the most consistent and greatest increase in gas reserves by both new discoveries and extensions and revisions of existing fields have been Texas, Louisiana, Oklahoma, and New Mexico in that order. The Commissioner concedes that the increases within these states have not necessarily been at a point to which the taxpayer's facilities presently extend. However, the areas within the states of Texas, Oklahoma, and New Mexico, where the principal growth of reserves occurred, have been contemplated by the taxpayer as sources of new supply.

The terms, extensions and revisions of existing fields should be explained. Briefly, extensions refer to the adjustment of previously estimated boundaries of known gas fields; revisions refer to the adjustment of previous estimates of known gas fields. These procedures continuously affect the estimated potential of a gas field and, therefore, are factors which properly should be considered when evaluating the taxpayer's reserve figures.

The taxpayer has emphasized that, not only are its easements inseparably connected with its transmission lines, but that its transmission lines are likewise inseparably linked to the gas reserves presently owned or controlled. However, the Commissioner rejects the latter assertion as not having any basis in fact. While the lines are connected with, the record does not show that they are necessarily confined to, any particular gas field. Before the taxpayer could make

any extension of its transmission lines, it is true that it would have to experience the proper market demands, negotiate contracts, and be granted a certificate of public convenience and necessity by the Federal Power Commission, but the fact remains that not only could it extend but it has in the years in question actually extended its transmission facilities to several new sources of supply. Furthermore, it considered proposals for additional extensions throughout the period in suit.

The Pawnee Rock fields in Kansas were added in 1946, and deliveries of gas began a year later. The Hugoton field in Texas was added by contract with the Shamrock Oil and Gas Corporation in 1946. The Commissioner observed that these additions marked new sources of gas supply for the taxpayer. In 1951 the taxpayer held an option to purchase 51% of the stock of the Permain Basin Pipeline Co. and secure thereby the gas produced by that company and transported through a proposed line connecting with the taxpayer's terminus in the Panhandle or the Hugoton fields. Subsequent to the years in suit, this option was exercised, marking its entry into another source of supply.

By the end of 1951, we are told, the taxpayer had acquired leases in North Dakota and South Dakota in the Williston Basin, in Nebraska and Colorado in the Denver-Julesburg Basin, and in Kansas and perhaps Oklahoma on the Anadarko Basin, which is in the immediate area of the taxpayer's present facilities. Also in 1951 the taxpayer was licensed to do business in the Province of Alberta, Canada, and took initial steps to secure

gas supplies in the area of the Alberta Basin.

It is difficult to ignore the impression, created by a composite of annual reports to the stockholders, that the taxpayer cannot rely alone on its gas reserves at any given period. As a part of its business operation it is constantly searching for and acquiring large supplies of gas. The annual reports also convey the knowledge that the taxpayer is not only able to maintain a reserve within reasonable (or set) limits to supply existing markets, but to increase its reserves sufficiently to expand into new markets every year. Whatever are the reasons for maintaining the supply at the level which the taxpayer does, they do not appear to stem from a national scarcity of the resource or from the effect of competition. As the taxpayer's senior Vice-President testified, there are very few companies, if any, which enjoy a better position in respect to the adequacy of its reserves than the taxpayer.

The taxpayer has, since 1930, abandoned somewhere in the neighborhood of 10 miles of transmission lines and, thereby, an equal amount of rights-of-way. The reason for the abandonment was to secure a more desirable location for operating purposes. Steadily through the years, the Commissioner noticed, the taxpayer has increased its pipeline system. Between the years 1946 and 1951 it increased its accumulated costs in rights-of-way for the entire system by some $689,000.

A crucial factor in the Commissioner's mind is that at the end of each year involved, the taxpayer had available in purchase contracts and under lease a steady and substantial gas supply. In view of that fact, can the useful life of the easements be said to be definitely ascertainable? The answer necessarily depends upon several factors. One is whether the known reserves are still increasing. If this is true, the useful life of the taxpayer's easements would appear to be an exceedingly difficult matter to judge. But Commissioner does not rely upon this factor alone. Numerous conditions known

to exist at the end of each taxable year tend to negate the proposition that the useful life has a limited and deerminable existence. The estimate of reserves owned or controlled by the taxpayer is considered only the starting point of such a determination, since the reserves are limited essentially by economic and operational considerations. Furthermore, whether they are reasonable in light of existing market demands is beside the point; even if they are, such reserves could not furnish an accurate means of forecasting available supply. The Commissioner therefore does not regard the taxpayer's known reserves at any one time as particularly significant, treating them more or less as indicative of its commitments than its future.

The Commissioner does find significant that the transmission lines are not inseparably linked to any known reserves, whether they are actually in the proportions that the taxpayer's statistics would indicate. The pipelines at best are connected with the fields and can be, as they have been, extended to additional fields. Another matter to consider is that throughout the years involved, not only did the proven reserves of natural gas in the nation increase, but the taxpayer's reserves almost doubled and at the end of 1956 its reserves had increased to an all-time high of 10.3 trillion cubic feet. The Commissioner took into account whether the taxpayer had continued from year to year to obtain its share of gas reserves, as well as to spend large sums of money expanding its market and facilities. Importance is attached to the taxpayer's growth financially from assets of $59,502,680 at the end of 1945 to $199,589,665 at the end of 1951 (and its further growth to $369,-432,482 in assets by the end of 1956).

Significantly related to general statements of prospects for future supplies, as given in the annual statements, is the fact that the taxpayer can procure its share of this gas by entering into additional gas purchase contracts with the producers of the gas. The market is competitive. In order to obtain gas from

new fields the taxpayer would have to pay the going price in the area as it has done in the past. The adjustment, however, is not radical, for the taxpayer now purchases 85% to 88%, and produces only 15% to 12% of the gas it sells. While a willingness to pay the price is clearly not all that is required to secure the additional gas supplies, it remains a large consideration and one which the Federal Power Commission takes into account in approving the rates the taxpayer may charge its consumers.

It was, then, by reason of these several factors, and not alone the estimate of reserves of gas owned or controlled at the end of each year, that the Commissioner was compelled to hold that the useful life of the taxpayer's rights-of-way is not susceptible of measurement and, therefore, has no limited and determinable existence. Moreover, as the Commissioner found that the gas reserves of the country and the taxpayer have kept pace with and, indeed, exceeded the demand for gas, he was prompted to suggest that these conditions, rather than diminishing the life of the taxpayer's rights-of-way, tend to increase its longevity, making the period of time they will be of value in its business all the more uncertain.

But we are not required to proceed quite so far. The Commissioner's assertion can be disregarded as can the taxpayer's expression of concern with the effect of such thinking on the accepted theories of accounting. Neither argument is relevant to the issue. This Court need only decide whether the Commissioner's conclusion that elements other than the proven reserves at the end of any year require consideration in the course of determining whether the useful life of the easement is susceptible of measurement. And, if this be true, we must then decide whether his determination on the basis of these factors that the useful life is not definitely limited in duration is erroneous.

Granting that exhaustion of the property is taking place, this Court is persuaded, from a review of all the stated factors that it is necessary to consider more than the taxpayer's offer in order to determine the measurability of exhaustion. In our opinion, the Commissioner's determination that the useful life of the taxpayer's rights-of-way for transmission lines is not ascertainable, timewise, seems unmistakably correct. We find the taxpayer's basis altogether too narrow. The fact the property is undergoing exhaustion is not a controlling factor, for alone it cannot justify the amortization of the cost of such an investment. With a definite time not established when exhaustion of the intangible asset would occur (only the fact that it is occurring), the taxpayer's easements cannot be treated as the subject of a depreciation allowance and, accordingly, its claims must not be allowed.

This is not to say that the taxpayer's theory would collapse under all circumstances. In resting its case upon the annual estimate of reserves, we are aware that the taxpayer was following the requirements of the Federal Power Commission. This is the basis for passing upon such matters as the taxpayer's applications for certificates of extensions of facilities or the adequacy of proposed rates for gas to be sold. It is also the basis used by the taxpayer in preparing registration certificates for the Securities and Exchange Commission, and for reporting information to investors and prospective investors in the taxpayer's securities. Generally it is the basis used by management in the conduct of the affairs of its business; in turn, all of the agencies, investors, and financial institutions with which the taxpayer deals base their action on the reserves owned or controlled by the taxpayer.

The basis chosen is important in a very material sense. The taxpayer is a regulated industry. It must be assured that its earnings are properly shown and that its expenditures for property will be recovered out of its earnings, for there is no opportunity to recover any loss from a miscalculation except by diminishing its surplus.

We therefore can readily see why the taxpayer would rest its case on these terms. But the short answer to this may be that the practice followed by other agencies does not establish a right to claim a deduction from income for depreciation under the revenue laws. We must look exclusively to the requirements specified in these laws. However, the apparent inconsistency in the various requiremnts may be less than is first assumed. It does not follow that a satisfaction of the regulations of one agency insures compliance with comparable regulations of another.

These agencies look to different matters and have no interest in uniformity as such. It is not uncommon nor surprising, in fact, to find their requirements lacking a standard interpretation, related as they are to different objectives. For example, while on the basis of known reserves the taxpayer may justify the approval of its application for an extension of facilities, that figure would not support an argument that, for depreciation allowance purposes, the useful life of the easements underlying the lines to be extended is similarly established. The contrary situation, by all logic, would prove to be the case. The incidence of extension supports the proposition that the useful life is definitely prolonged.

But regardless of the regulations elsewhere, or why they exist, we are concerned here with the single question whether the claims for depreciation of these easements as asserted can be reconciled with the treasury regulation specifying upon what basis such claims are allowed. With this in mind, we can dispose of one further contention of the taxpayer. It raises the point that, should it be denied the right to amortize its costs over a period of 25 years, which is the optimum estimated life of its known reserves, it will be faced with the necessity of having to defer charging its costs until the year in which the rights-of-way are abandoned. This alternative is thought not only to be an improper method of accounting for the taxpayer's income but to hold out limited prospects for the ultimate recovery of its investment.

Of course, whether it is an improper method of accounting only begs the question. Whether the abandonment would occur all at once, accepting that the time has arrived when an abandonment is required, is hardly conceivable. Aside from the fact that, as the supplies diminish, the Federal Power Commission may somehow regulate distribution, should the point be reached where allocation of supplies does result in a curtailment of operation and therefore demand, the reasonable supposition is that such activity will be gradual, and thus the abandonment of lines would occur in stages. As the abandonment occurs gradually, there will still be income from the remaining operations by which to recover the investment, at least short of the time when the entire operation (progressively contracting as it hitherto would have been) of long-distance transmission lines becomes uneconomical.

The taxpayer will not be caught unawares. And long before this point of curtailed operation is reached, such increased costs of operation can and undoubtedly would be taken into consideration by the Commission when considering proposed rates. Thus, it is presently difficult to accept the argument of the taxpayer that it will not receive its full benefits taxwise should the deduction be deferred until some future time when the gas supplies, which are presently available in increasing measure, become definitely limited in amount. And certainly when this phase is reached, abandonment can definitely be anticipated, whereupon the requirements of the treasury regulation, now found unsatisfied, will be met.

In other words, by saying that, because it must wait, the taxpayer is required to take unreasonable risks regarding the recovery of its investment, is simply taking for granted what is incumbent upon the taxpayer to prove. If the risk were actually present, the taxpayer's case would be established. The Commissioner has reasoned, however, that the risk

does not exist, that the taxpayer has no basis to claim an allowance, for the evidence does not demonstrate that the useful life of the easements, in terms of known or reasonably ascertainable conditions, is definitely limited in duration. When the useful life becomes susceptible of measurement or, so to speak, when there is any actuality that the apprehensions regarding future supplies assume the proportions of a reality, we shall have the question, not whether the Commissioner's decision is erroneous, but whether taxpayer's claims are reasonable. In the meantime, a proper regard of the standards applicable in determining whether the taxpayer's rights-of-way are presently depreciable does not, for the saying, create inequities such as the employment of improper methods of accounting.

It is long past the time when we should have mentioned the case of Union Electric Co. v. C. I. R., 8 Cir., 177 F.2d 269. As heavily as the taxpayer has relied upon it, we cannot see how it supports its case. Union Electric, to us, is immediately distinguishable on the facts for in that case "the useful life of these intangible rights (easements) is definitely connected with the useful life of the dam, which is found to be 100 years," page 275. The usefulness of the transmission line rights-of-way, however, is not inseparably connected with the taxpayer's proven reserves nor, in view of the factors determined necessary to consider, can we say the transmission lines themselves are within the fields. Hence the useful life of the easement is not definitely limited in duration.

Union Electric is relevant insofar as the taxpayer's rights-of-way for gathering lines are concerned. These lines connect directly with the gas wells and bring the gas to central points for transmission. Obviously the rights-of-way for gathering lines would have no useful life after the particular wells or areas are depleted and, therefore, the taxpayer is entitled to deduct, on the basis of the ascertainable limits of these reserves, the costs of the easement along with, and

over the same period as, the overall investment in the gathering lines. The parties agree as to the application of the rule here.

The case at bar, however, lacks the crucial factor which permitted the taxpayer in the Union Electric case to prevail on its claim. As the evidence indicates, precisely the opposite situation exists: the transmission pipelines are available for gas reserves anywhere in the western part of the United States where they are located. As it was shown that these reserves are still increasing, the useful life of the easements becomes impossible to measure.

We reach the point where it is convenient to recapitulate. There is no demonstrably inseparable connection between the taxpayer's transmission pipelines and its proven reserves, so the estimated life of those reserves affords little measurement of the usefulness, timewise, of the transmission line rights-of-way. Furthermore, the taxpayer confined its consideration to the single factor of proven reserves. Had it been established that the lines and the reserves were so connected, we still could not say that the proven reserves as estimated by the taxpayer are an adequate measurement of the useful life of the easements. It is clearly shown that innumerable adjustments must be made when considering the taxpayer's figures of proven reserves, and as so qualified those figures fall short of demonstrating that the life of the easements is limited in duration. We have remarked earlier that the fact the easements are undergoing exhaustion is insufficient to establish a case. We must be shown a fixed time when the property would be rendered useless. This, singularly, the taxpayer has not been able to do.

We are therefore constrained to hold that the burden of establishing its right to the claimed deductions has not been sustained. These actions are dismissed with prejudice, costs taxed to the plaintiff. Counsel for the defendants should prepare and submit a suitable order within 20 days.