16510

LEE v. DeBERRY *ET AL.*
(65 S. E. (2d) 775).

384

*Messrs. Neil Brooks, Associate Solicitor, U. S. Dept. of Agriculture,* of Washington, D. C., *Ben Scott Whaley, U. S. Attorney,* of Charleston, *Russell D. Miller, Ass't U. S. Attorney,* of Florence, and *Emily A. Kindel, Attorney, U. S. Dep't of Agriculture,* of Washington, D. C., *for Appellants,*

*Messrs. Willcox, Hardee, Houck & Palmer,* of Florence, *for Respondent,*

*Messrs. Neil Brooks, Associate Solicitor U. S. Dept of Agriculture,* of Washington, D. C., *Ben Scott Whaley, U. S. Attorney,* of Charleston, *Russell D. Miller, Asst. U. S. Attorney,* of Florence, *John C. Bagwell, Attorney, U. S. Dept of Agriculture,* and *Donald A. Campbell, Attorney, U. S. Dept. of Agriculture,* both of Washington, D. C., *in Reply,*

June 1, 1951.

FISHBURNE, Justice:

The issue in this case was brought before the court of common pleas for Florence County pursuant to the provisions of Sections 361-368 of the Agricultural Adjustment Act of 1938, 52 Stat. 62-64, 7 U. S. C. A. §§ 1361-1368. The case is one of novel impression in this court, and, under the Federal Act referred to, relates to the tobacco acreage allotment for tobacco growers.

The controversy arises out of the fact that the plaintiff, S. E. Lee, who will hereafter be referred to as respondent, had for a number of years prior to 1949, been engaged in farming in Florence County on certain lands owned by him; and also on another tract in that county which he leased, known as the Kuker lands. The Kuker lands were sold in the year 1948. Prior to the sale, the tobacco acreage allotment of the respondent had been established with respect to his lands and the Kuker Tract, as 24.6 Acres. By reason of the sale, it became necessary for this allotment to be apportioned between the respondent's·lands and the Kuker lands.

For the year 1949, the Florence County Committee apportioned twenty acres as the tobacco acreage allotment for respondent's lands, and four and six-tenths acres to the Kuker lands. Respondent contends that he was entitled to 21.2 acres, which would have reduced the Kuker apportionment to 3.4 acres.

Under the Act, quotas in each county are allotted by the County Committee elected by the farmers in the county. In the event of dissatisfaction with the allotment, it may be reviewed by a Review Committee, also composed of farmers but the findings of fact by the Review Committee, if supported by the evidence, are made final and conclusive.

Due to the adverse ruling of the County Committee, respondent duly appealed from its decision to the Review Committee. In accordance with the regulations of the Secretary

of Agriculture, a hearing was held by the Review Committee, testimony of all witnesses presented, the exhibits offered were received, and the entire record reviewed. Thereafter, the Review Committee made its findings of fact and affirmed the action of the County Committee. Respondent thereupon commenced this action in the state court, as allowed by the Agricultural Adjustment Act of 1938, to compel the Review Committee to re-classify his allotment and to establish his tobacco acreage allotment at 21.2 acres instead of at 20 acres. The complaint is based upon the contention that the Kuker Tract contains only 23.7 acres of cropland rather than 34.7 acres of cropland as found by the County Committee and affirmed by the Review Committee, and that an apportionment based on the lower figure for the Kuker Tract would give the respondent 21.2 acres for which he contends.

The lower court sustained this claim of respondent, and ordered the matter remanded to the County Committee, with directions to establish the respondent's tobacco acreage allotment at 21.2 acres and reduce the Kuker tract allotment to 3.4 acres.

The scope of judicial review in a proceeding of this kind under the Agricultural Adjustment Act of 1938, as amended, is limited by the explicit provisions of the Act to questions of law. The court is directed to affirm the determination of the Review Committee if its findings of fact are supported by substantial evidence. If so supported, such findings are made conclusive. Sec. 366 of the Act, 7 U. S. C. A. § 1366.

It is generally held by the Federal Courts (similar to our own decisions on appeal from the findings of administrative boards) that the requirement that there must be substantial evidence, does not require that there be proof beyond a reasonable doubt, but only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. For cases supporting this generally recognized rule, see *Merchants Warehouse Co. v.*

*United States,* 283 U. S. 501, 508, 51 S. Ct. 505, 75 L. Ed. 1227; *Swayne & Hoyt, Ltd. v. United States,* 300 U. S. 297, 57 S. Ct. 478, 81 L. Ed. 659; *Rudd v. Fairforest Finishing Co.,* 189 S. C. 188, 200 S. E. 727; *Consolidated Edison Co. v. National Labor Relations Bd.,* 305 U. S. 197, 59 S. Ct. 206, 83 L. Ed. 126. And see the kindred authorities cited in Annotation, 123 A. L. R., 612-646.

The Federal law governs in the interpretation of ■ Federal statutes, even though the case is in a state court. *Brady v. Southern Ry. Co.,* 320 U. S. 476, 479, 64 S. Ct. 232, 88 L. Ed. 239; *Miller v. Atlantic Coast Line R. R. Co.,* 90 S. C. 249, 73 S. E. 71.

In order to uphold the findings of the Review Com-■ mittee, the evidence should furnish a reasonably sound basis from which the facts in issue may be fairly inferred, and a good rule for weighing the evidence to ascertain whether it is adequate, is to compare it with the evidence necessary to sustain the verdict of a jury upon a similar issue If only one reasonable inference can be drawn from the evidence, it becomes a question of law for the court.

The question presented by this appeal is whether, in connection with the establishment of the 1949 flue-cured tobacco acreage allotment and farm marketing quota for respondent's farm under the Agricultural Adjustment Act of 1938, as amended, 7 U. S. C. A. § 1281 *et seq.,* the Review Committee's findings of fact regarding the amount of cropland in the part of the farm known as the Kuker Tract, are supported by evidence. We are, therefore, concerned only with the evidence and its sufficiency.

As stated, the basic issue has to do with the cropland acreage on the Kuker tract, which is divided into five comparatively small fields. Were the County Committee and the Review Committee correct in finding this acreage for the purpose of tobacco allocation to consist of 34.7 acres, or 23.7 acres, as contended by respondent? There is a difference of 11 acres, which, as pointed out by respondent, would increase his allotment from 20 acres to 21.2 acres.

Cropland is defined in the regulations of the Secretary of Agriculture governing tobacco acreage allotments and marketing quotas for the 1949-1950 marketing year, as follows:

"(e) 'Cropland' means that land on the farm which is included as cropland for the purposes of the 1948 Agricultural Conservation Program, but shall not include wood or waste land from which no cultivated crop was harvested in any of the years 1944 through 1948." (7 C. F. R. 725.12 (e) 13 F. R. 4813).

This definition incorporates by reference the definition of cropland for the purposes of the 1948 Agricultural Conservation Program, which is as follows: "B. Cropland means farm land which in 1947 was tilled or was in regular rotation." (South Carolina Handbook, 1948 Agricultural Conservation Program, issued November, 1947, p. 13; quoted by the court below, R. 51).

By combining these two definitions, the following is derived: " 'Cropland' means that land on the farm which in 1947 was tilled or was in regular rotation, but shall not include wood or waste land from which no cultivated crop was harvested in any of the years 1944 through 1948."

It will be seen that the affirmative requirement of this definition is that the land either was tilled in 1947 or was in regular rotation in 1947.

The first question we shall consider is whether the trial judge erred in holding, as to fields Nos. 13, 14, and 18 of the Kuker Tract, that the amounts of cropland thereon were, respectively, 7.4 acres, 4.2 acres, and 4.4 acres, while the appellants claim, in accordance with the findings of the Review Committee, that the respective acreage thereon was 8.1 acres, 4.9 acres, and 4.8 acres.

These fields are admittedly cropland. The only dispute relates to their size, which according to the measurements of the County Committee affirmed by the Review Committee, is 17.8 acres. Respondent contends that in accordance with

his measurements and the holding of the lower court, they have a total of 16 acres. The difference would appear to be inconsiderable. But in our opinion, the testimony on this issue is fully sufficient to support the findings of the Review Committee, and the lower court erred in not so holding. We do not have here a question of law, but conflicting evidence is presented from which different inferences may be drawn.

The measurements of these three fields were made by Mr. M. C. Peterman, State Performance Supervisor and Mr. Archie Lee Bacot, Florence County Performance Supervisor, and consisted of physical measurements on the land, with a chain designed for the purpose. The measurements were made in the presence of respondent and the County Committee, from field boundaries which were determined by observation.

In addition to this, the measurements were checked by plotting and scaling on aerial photographs which are used regularly in programs of the Production and Marketing Administration, United States Department of Agriculture.

The measurements of these three fields were made for Respondent by Mr. R. J. Smith, a surveyor. As shown by the record, he did not measure from field boundaries determined by observations, but from stakes placed for that purpose by former tenants of respondent. The tenants told Mr. Smith that when placing the stakes, they represented the boundaries of the area actually cultivated. It would seem reasonably evident that Mr. Smith cut the boundaries short in making his measurements.

The Review Committee, therefore, had before it two sets of measurements, and in determining which measurements to accept, it necessarily had to weigh the evidence, and also had to determine the credibility of the witnesses. This evidence certainly gave rise to more than one reasonable inference. And concerning the measurement of these three fields, it was in our opinion, error for the court to set aside the Review Committee's findings of fact.

The dispute with reference to field No. 3 of the Kuker tract relates to its status as cropland rather than to its size. Error is assigned to the trial judge in holding as to this field of the Kuker tract, that there was no cropland thereon; whereas appellants claim, and the Review Committee found, that there is 4.6 acres of cropland in this field.

As appears from the testimony offered by appellants, this field was shown as cropland in the aerial photographs made in 1941, and these photographs are used as a basis for the administration, both of the marketing quota program and the agricultural conservation program. This field was originally a part of the 240.1 acres of the respondent's farm, which were classified by the County Committee as cropland during the period 1945-1947. This classification was without objection from the respondent, because he benefited from the classification; and the land had been classified as cropland since 1941 by the County Committee. A crop of corn was grown on the field in 1944-45, or in 1946. The exact date is not definitely fixed, but the evidence that the corn was grown in one of these years is uncontroverted. A garden was grown on about one-fourth of an acre of the field in 1947, and "peas or something" were planted thereon in 1949.

Manifestly, corn was not planted on waste land in 1944, 1945, or 1946; nor is it reasonable to suppose that a garden was planted on waste land in 1947, and peas in 1949. We think the reasonable inference may be drawn that this field No. 3 was in regular rotation in 1947—that is, it was land lying idle only from time to time in accordance with the usual, normal, ordinary rotation employed on a farm.

Respondent's counsel stress in their brief, the meaning of the phrase "regular rotation," as such phrase is used in the definition of "cropland." It is said that crop rotation is the order of recurrence in cropping. We think that respondent's argument too narrowly limits the expression "regular rotation," with reference to crop plant-

ing. In our opinion, this phrase does not carry the literal interpretation of a fixed, definite, systematic, planned rotation which precludes change or deviation. We think further that it is a matter of general knowledge that farmers do not employ an ideal or absolutely scientific rotation system.

The Agricultural Adjustment Act, as we read it, affords no authority to the Secretary of Agriculture to adopt any particular system of rotation in order for a farmer to receive his maximum tobacco acreage allotment. In our opinion, the phrase, "regular rotation," should not be literally or technically interpreted; it means nothing more, in our opinion, than the rotation normally or usually followed on the farm.

The cropland status of field No. 3 of the Kuker tract was reaffirmed by the County Committee in 1947, when it made a personal inspection of the farm at the request of respondent for the purpose of reclassifying the land in the Kuker tract. And the testimony presented by appellants tends to show that this continued classification of field No. 3 as cropland was not objected to by respondent.

The trial judge is charged with error in holding as to field No. 17 of the Kuker tract, that there are 7.7 acres of cropland thereon. Appellants contend, as found by the Review Committee, that there are 12.3 acres of cropland thereon, the difference, to wit: 4.6 acres, being in the "L" shaped portion of the field.

With reference to this "L" shaped section, which contains 4.6 acres, we are concerned with its status as cropland rather than with its size. This "L" shaped section, as shown by the record, was shown as cropland in the aerial photographs made in 1941 for the purpose of the marketing quota and agricultural conservation program. It was a part of the acreage of respondent's farm at that time, and was classified by the County Committee as cropland during the period 1945-47.

It is true that no crop was grown on this section in 1946 or 1947, but its cropland status was reaffirmed by the County

Committee in 1947 when it made a personal inspection of the farm at the request of the respondent for the purpose of reclassifying the land in the Kuker tract. And the record shows that the continued classification of this "L" shaped section as cropland was not objected to by respondent. In fact, in 1947 the respondent applied for and received from the Secretary an agricultural conservation program payment based upon the cropland status of the "L" shaped section. Nor is there anything tending to show that it was not in regular rotation. The mere fact that it was not cultivated in 1946 or in 1947, we think is not inconsistent with the finding that it was in regular rotation.

In a proceeding before the Review Committee, the ■ burden of proof is on the respondent as to all issues of fact raised by him. 7 C. F. R., 711.25(e). So that it follows with respect to the contention of respondent— that certain acreage was not cropland or was not in regular rotation—the burden of proof with respect to that issue is incumbent upon respondent.

It should be kept in mind in this proceeding, that it ■ is not the Court's function to substitute its judgment for that of the Review Committee where the Committee has applied the broad phrases "cropland" and "regular rotation" to a specific state of facts; and there is substantial evidence in the record to support its conclusions. *Cardillo v. Liberty Mutual Ins. Co.*, 330 U. S. 469, 67 S. Ct. 801, 91 L. Ed. 1028; *National Labor Relations Board v. Hearst Publications*, 322 U. S. 111, 64 S. Ct. 851, 88 L. Ed. 1170.

In addition to the facts which existed in 1947, the record shows that the "L" shaped section was again tilled in 1948. A crop of corn was planted and fully bedded, but was abandoned before harvest. This fact, together with the other evidence in the record, supports the conclusion that the section was in regular rotation in 1947. Certainly, land that was in rotation and which had been classified as cropland for many years, would be more likely to be planted in 1948 than land that had never been cultivated.

The fact that the 1948 corn crop was abandoned before harvest, we think is immaterial. Such abandonment could have been due to any one of several reasons, unrelated to the prior status of the land. It must be remembered that the statute. speaks of cropland "available for production of tobacco."

We have given careful attention to the record in this case, and after a full consideration we are constrained to hold that there is substantial evidence. to support the findings of the Review Committee on all issues, and therefore the judgment below should be reversed. In other words, if this were a jury case, we think there is sufficient evidence upon which the case could be and should be submitted to them.

Judgment reversed.

TAYLOR and OXNER, JJ., and E. H. HENDERSON and STEVE C. GRIFFITH, A. A. JJ., concur.