275 F.2d 264
 REVIEW COMMITTEE, VENUE VII, COMMODITY STABILIZATION SERVICE, UNITED STATES DEPARTMENT OF AGRICULTURE, Sitting in the City of Wahoo, Nebraska, in and for Saunders County, Appellant,
v.
Harold WILLEY, Appellee.
 No. 16285.
 United States Court of Appeals Eighth Circuit.
 February 18, 1960.
 
 William Montgomery, Atty., Civil Division, Dept. of Justice, Washington, D. C., for appellant.
 Lyle B. Gill, Fremont, Neb., for appellee.
 Before GARDNER, WOODROUGH and BLACKMUN, Circuit Judges.
 BLACKMUN, Circuit Judge.
 
 
 1
 This case arises under the Agricultural Adjustment Act of 1938, 52 Stat. 31, as amended, 7 U.S.C. § 1281 et seq., hereinafter called "the Act." It comes to us by way of an appeal by the Review Committee of Saunders County, Nebraska, from a final decision of the District Court setting aside that committee's refusal to disturb the County Committee's 1959 wheat acreage allotment for the farm of Harold Willey, a Saunders County farmer, and remanding the case to the Review Committee "with directions to make a determination of the plaintiff's base wheat acreage for his 1959 crop on the basis, not of his crop history as was done, but of his long range crop rotation system as instituted and now established on his farm." The District Court has jurisdiction under § 1365 of the Act.[1] The court did not stay the Review Committee's determination although it had power to do so under § 1367.
 
 
 2
 The appellee, whom we shall call the plaintiff, is the owner and operator of a 320 acre farm in Saunders County in eastern Nebraska. 285 of the acres in this half section are tillable or "crop acres."
 
 
 3
 There is little dispute about the basic facts and most of them are admitted in the pleadings. The farm in question is a family farm and had belonged to the plaintiff's father. It is hilly and susceptible to erosion. The plaintiff began to operate the farm himself in 1950. For about 20 years prior to that time it had been rented to tenant operators. During that 20 year period the farm, through unsuitable soil conservation practices and excessive planting of row crops, had become eroded and severely cut up with ditches and gullies. Since 1950 the plaintiff has endeavored to revive and improve the farm. He has filled in washed areas, sown grasses, planted red clover and alfalfa as soil builders, eliminated row crops, and fixed up the ditches. There is now only one ditch which is troublesome for farm operations.
 
 
 4
 The plaintiff is principally an alfalfa farmer and so describes himself. He has been the largest supplier for the alfalfa dehydrating plant at Leshara, Nebraska, 5 miles from his farm. In 1958 the plaintiff planted 248.8 acres of his farm to alfalfa and that entire crop went to this plant. Its next largest farmer-supplier in 1958 had only 70 acres in alfalfa. The plaintiff normally obtains 4 cuttings of alfalfa a summer, as compared with 3 for some producers in the area. His product is clean because he has planted his alfalfa in wheat stubble in the fall and this prevents weeds from getting a foothold. If alfalfa is planted in the spring on corn or with a nurse crop of oats, an alfalfa crop the first year is not customarily realized. The plaintiff's farm although hilly is not rough. This has enabled the heavy equipment required for cutting the crop and supplied by the dehydrating plant to get around the farm without difficulty.
 
 
 5
 Alfalfa will dehydrate the soil. The roots go down 20 to 25 feet and after a few years the soil becomes root locked. As a consequence, after about the fourth or fifth season, alfalfa should be plowed up and the crop rotated. In due time the roots then rot out. Wheat is a satisfactory rotation crop because it takes a small amount of moisture. An ideal arrangement for crop rotation on the plaintiff's farm would be to have it one-third in wheat and two-thirds in alfalfa at all times. Alfalfa dries the soil to a much greater depth than any other crop commonly grown in eastern Nebraska. Conservation of water is a matter of serious consideration there.
 
 
 6
 Plaintiff's crop history shows the following:
 
 
 7
 Other
 Wheat Wheat Alfalfa Crop
 Year Allotment Acres Acres Acres

 1951 ........ Not in effect 35 65 185
 1952 ........ Not in effect 35 90 160
 1953 ........ Not in effect 35 159 91
 1954 ........ 29 35 210 40
 1955 ........ 24 45 228 12
 1956 ........ 23 65 220 0
 1957 ........ 23 33 252 0
 1958 ........ 44.2 36.2 248.8 0
 
 
 8
 The plaintiff probably would have planted more wheat acres during the wheat allotment years if it had not been for the allotment system. He filed a protest in 1953, the first year allotments were being made, against his acreage allocation. The plaintiff's plan of crop-rotation is to alternate his alfalfa with wheat, plowing up the alfalfa every 4 to 6 years and leaving wheat in for 3 years. This plan conforms to the best practices of soil conservation and steady income.
 
 
 9
 There is nothing in the record to suggest that the plaintiff is anything but an industrious and effective farm operator. His plea for more wheat acreage is evidently based upon a conviction that, so far as his particular farm is concerned, wheat-alfalfa rotation is the best and, for him, the most productive system. There is an intelligent and practical basis for his crop-rotation plan.
 
 
 10
 Because this is the first case under § 1365 to reach this court, it seems worthwhile, at the risk of lengthening this opinion, initially to review the pertinent and complex provisions of the Act and their administrative interpretation and application for the year 1959, and thus better to grasp the positions of the respective parties here.
 
 
 11
 Section 1282 is the declaration of Congressional policy. It remains in its original 1938 form and reads in its entirety:
 
 
 12
 "It is declared to be the policy of Congress to continue the Soil Conservation and Domestic Allotment Act, as amended, for the purpose of conserving national resources, preventing the wasteful use of soil fertility, and of preserving, maintaining, and rebuilding the farm and ranch land resources in the national public interest; to accomplish these purposes through the encouragement of soil-building and soil-conserving crops and practices; to assist in the marketing of agricultural commodities for domestic consumption and for export; and to regulate interstate and foreign commerce in cotton, wheat, corn, tobacco, and rice to the extent necessary to provide an orderly, adequate, and balanced flow of such commodities in interstate and foreign commerce through storage of reserve supplies, loans, marketing quotas, assisting farmers to obtain, insofar as practicable, parity prices for such commodities and parity of income, and assisting consumers to obtain an adequate and steady supply of such commodities at fair prices."
 
 
 13
 Further policy references directed specifically to wheat are in the legislative findings of § 1331.[2] § 1332 directs the Secretary of Agriculture by May 15 of each calendar year to ascertain and proclaim the national acreage allotment for the crop of wheat produced in the next succeeding calendar year. This allotment is defined as that acreage which, on the basis of the national average yield for wheat, will produce an amount adequate, together with estimated carryover at the beginning of the year and imports, to make available a supply equal to a normal year's domestic consumption and exports plus 30 percent. The national acreage allotment for wheat for any year shall not be less than 55 million acres. § 1333.
 
 
 14
 The national wheat acreage is then, under § 1334, apportioned by the Secretary among the states, the allotment to each state is apportioned among its counties, and the allotment to each county is apportioned by local farmer committees[3] among the farms in the county. Different criteria govern the apportionment of the respective wheat allotments among the states, the counties and the farms. In making the state allotments, the Secretary, after a 1 percent reserve, is required to allocate "on the basis of the acreage seeded for the production of wheat" during the immediately preceding 10 years "with adjustments for abnormal weather conditions and trends in acreage during such period." In distributing the state allotment among the counties, the Secretary's apportionment, after a reserve of up to 3 percent, is again "on the basis of the acreage seeded for the production of wheat" during the prior 10 years but "with adjustments for abnormal weather conditions and trends in acreage during such period and for the promotion of soil-conservation practices." The allotment among the individual farms, made through the local committees, is then on "base acreage" which depends upon "past acreage of wheat, tillable acres, crop-rotation practices, type of soil, and topography." § 1334(a) (b) and (c).
 
 
 15
 When the Secretary determines that the total supply for the coming wheat marketing year (July 1-June 30, § 1301 (b) (7)) will exceed "the normal supply for such marketing year by more than 20 per centum" he is required to "proclaim such fact" and then a "national marketing quota shall be in effect with respect to the marketing of wheat." § 1335(a). That quota will be suspended, however, if more than one-third of the farmers voting in a referendum, which the Secretary must conduct by July 25, oppose the quota. § 1336. A penalty is imposed on any "farm marketing excess of * * * wheat." § 1340.
 
 
 16
 All acreage allotments and the farm marketing quotas established for farms in the county are available for public inspection and notices of the farm marketing quota and of the farm acreage allotment are mailed to the farmer. § 1362. Any farmer who is dissatisfied with his quota may, within 15 days after the mailing of notice to him, have the quota reviewed by a review committee consisting of three farmers appointed by the Secretary from the same or nearby counties. The persons comprising the review committee must be different from those on the county committee. § 1363.[4] If the farmer is dissatisfied with the determination of the review committee, he may, within 15 days after notice, file a "bill in equity" against the review committee in the United States district court or institute proceedings for review in a proper State court. § 1365. This court review "shall be limited to questions of law, and the findings of fact by the review committee, if supported by evidence shall be conclusive." § 1366. "Notwithstanding any increase of any farm marketing quota for any farm as a result of review of the determination thereof under sections 1361-1368 * * *, the marketing quotas for other farms shall not be affected." § 1368. By § 1375(b) the Secretary "shall prescribe such regulations as are necessary for the enforcement" of the Act.
 
 
 17
 We turn now to the year 1959. In March, 1958 the Secretary proclaimed that a marketing quota would be in effect for the 1959-60 wheat marketing year. 23 F.R. 1948, 7 C.F.R. (1959 Supp.) 728.902. The applicable facts resulted in the setting of the 1959 national acreage allotment at the 55 million acre statutory minimum. 7 C.F.R. (1959 Supp.) 728.903. Allocation of acreage among the states followed and Nebraska received 3,204,664 acres. 23 F.R. 1985, 7 C.F.R. (1959 Supp.) 728.904. Saunders County, Nebraska, then received 33,804 acres of the state allotment. 7 C.F.R. (1959 Supp.) 728.907. The referendum held June 20, 1958 among wheat producers favored the quota by more than the required two-thirds percentage and the quota remained in effect. 7 C.F.R. (1959 Supp.) 728.909.
 
 
 18
 The Secretary in due course issued regulations with respect to the 1959 wheat crop. These required the county committees to establish for each farm, in determining its 1959 base acreage, an "historical average acreage" which approximated the average of the acreage of wheat reaching maturity in each of the years 1954-1957, inclusive. 7 C.F.R. (1959 Supp.) 728.912(m), 728.917(b). The committee could then adjust this historical average acreage if it decided that one or more of the years in the four-year base period should be eliminated for any one of five specified and numbered Reasons. (The first three Reasons stated are not applicable to this case.) The fourth and fifth Reasons (23 F.R. 1672, 7 C.F.R. [1959 Supp.] 728.917[c] [1]) have to do with the situation where the historical average wheat acreage is:
 
 
 19
 "(iv) No longer representative because of a change in operations which results in a substantial change in the established crop-rotation system for the farm.
 
 
 20
 "(v) Not appropriate for 1959 because of a definitely established crop-rotation system being carried out on the farm."
 
 
 21
 If the committee eliminates any of the four years from the base period the average of the remaining years constitutes the adjusted average acreage; if all four years are eliminated the adjusted average acreage is zero. 7 C.F.R. (1959 Supp.) 728.917(c) (2). In the latter case the committee may fix a new base acreage comparable with those acreages for farms which are similar with respect to tillable acres, type of soil and topography and which are similarly operated with respect to the rotation of crops, 7 C.F.R. (1959 Supp.) 728.917(c) (3). If, however, all the years in the period are eliminated under Reason (v), the adjusted average acreage may be adjusted upward but not above "the acreage of cropland for the farm." If the adjusted average acreage is zero because one or more of the years in the base period is eliminated by Reason (iv), the adjusted average acreage may be adjusted upward but not to exceed "the acreage indicated by cropland." 7 C.F.R. (1959 Supp.) 728.917(c) (3) (i). "Acreage indicated by cropland" means the number of acres computed by multiplying the cropland acreage for a farm by the ratio of historical wheat acreage for all farms in the community to the cropland acreage for those farms. 7 C.F.R. (1959 Supp.) 728.911(g).
 
 
 22
 On June 10, 1958, the Saunders County Committee issued to the plaintiff a written notice that his wheat allotment for the 1959 crop year was 44.3 acres. It reached this figure in the following manner: The plaintiff's wheat acreage history for the base period 1954-1957, as set forth above, showed an average of 44.5 acres. If the county acreage allotment had been applied pro rata to this figure, the plaintiff's farm would have received a final allotment of 30.3 acres. The Committee, however, on the basis of Reason (iv), eliminated the three lowest years, 1954, 1955 and 1957. The plaintiff's adjusted average acreage was thus set at 65 acres attributable to 1956 alone. This resulted, on the pro rata basis, in the 1959 allotment of 44.3 acres. The plaintiff filed a timely application for review.
 
 
 23
 At the hearing before the review committee the Chairman of the County Committee testified that in determining allotments in Saunders County his committee considered only crop history although they "are supposed to take into consideration the topography and the farming methods and setup." A portion of the contents of the 1959 Wheat Allotment County Handbook, supplied by the Department of Agriculture to the County Committee, was placed in evidence. This refers to the reasons for adjustment of historical acreages and reads:
 
 
 24
 "2. Change in Crop Rotation. No adjustments should be made for Reason 4, unless it is definitely known that a change in operations on the farm has occurred which will change the crop-rotation system that was practiced during the base period to a crop-rotation system that is to be followed in 1959. * * *
 
 
 25
 "3. Established Crop-Rotation. No adjustment shall be made for Reason 5 unless it is known that there is a definite crop-rotation system followed on the farm which involves a substantial change in the acreage planted to wheat from year to year. Adjustments properly made under this reason for 1958, * * * will generally necessitate compensating adjustments for 1959 to conform with the rotation being followed on the farm; and similarly, adjustments made under this reason for 1959 will necessitate compensating upward or downward adjustments for subsequent years."
 
 
 26
 A University of Nebraska agronomist testified that by sowing alfalfa in wheat stubble a much better stand is acquired than if it is sown with oats in the spring; that on the basis of plaintiff's figures alfalfa would be more profitable than almost any other crop; that from the standpoint of soil conservation and steady income wheat and alfalfa are an excellent rotation; that apart from soil erosion and consequent land depletion, corn in the long run would be more profitable than wheat or alfalfa; that he knew of no other cropping system on hilly land which might produce as good and as dependable an income and at the same time conserve the soil as wheat and alfalfa; and that he would not say that plaintiff should have less than one-third of his land in rotation. There is some indication in the record that no one else in Saunders County was in the same position as the plaintiff and that other farmers with the same acreage have a greater wheat allocation than plaintiff because of their greater wheat acreage history. The review committee concluded that the purpose of the allotment program "was to control wheat production by each producer taking his fair share of any reduction needed" and that the "plaintiff's farm had received fair consideration and allotted a higher base than the history justifies." The plaintiff then filed a timely complaint with the district court.
 
 
 27
 The plaintiff's position may perhaps fairly be stated as follows: The statutory policy enunciated in § 1282 is self-explanatory and its emphasis upon soil conservation, soil conserving crops and practices, and parity of income are meaningful. The factor of soil conservation stressed in § 1334(b) and the five factors spelled out in § 1334(c) are all to be given effect and allocations are not to be made solely on past acreage. Plaintiff is not a producer of surpluses and he takes his share of the reduction in the percentage factor. His rotation is intelligent and proper. It was established in 1951. Reason (v) controls. His early small wheat plantings do not contra-indicate this for he was hemmed in by severe penalties for excess acreage. The county committee allotment in effect penalizes him for not growing wheat in the past. The limitation under Reason (iv) of "acreage indicated by cropland" is arbitrary and unreasonable.
 
 
 28
 The committee's position is that the county committee and the review committee did the very best they could for this farmer. The plaintiff's rotation system represented a substantial change in the established crop-rotation system for the farm and Reason (iv) controls. Reason (v) cannot control because, while there may be a definitely established crop-rotation system being carried out on the farm, it does not involve "a substantial change in the acreage planted to wheat from year to year." The county committee was most generous in not eliminating from the base the high year of 1956. If 1956 had also been eliminated, plaintiff would have a zero base and "acreage indicated by cropland" would be his upper limit. This, for Saunders County, should be 15 acres in his case. This limitation and the regulations are valid.
 
 
 29
 The trial court held that Reason (v) was not available to the plaintiff because there was no substantial annual change in the acreage planted to wheat; that, however, all the years, and not just three, in the base period should have been eliminated; that, having adopted and put into practice a long-term crop rotation system, plaintiff is now required to allocate a larger acreage of his farm to the growing of wheat; that in this light he is not a producer of wheat surpluses; that his wheat crop history should not be considered in determining his base wheat acreage; that upon an adjusted average acreage of zero the plaintiff's base wheat acreage may be adjusted to compare with systems employed on other farms similarly situated and having the same problems; and that once this is done "justification will be found under the regulations for a greater base acreage than has been allowed." No reference was made by the court in its memorandum to the "acreage indicated by cropland" limitation, under Reason (iv), contained in 7 C.F.R. (1959 Supp.) 728.911(g).
 
 
 30
 The question of mootness perhaps should initially be mentioned inasmuch as the plantings of the 1959 crop year in Nebraska have already been made. We feel that the case is not moot. This is because of the existence of possible penalties and because of the use of 1959 as one of the base period years in connection with the 1960 wheat crop. § 1334(c) and 24 F.R. 2475.
 
 
 31
 The constitutionality of the Act has been upheld as being well within the powers granted Congress by the Commerce Clause of the Constitution, Article I, § 8, clause 3, Wickard v. Filburn, 317 U.S. 111, 118 et seq., 63 S.Ct. 82, 87 L.Ed. 122; Mulford v. Smith, 307 U.S. 38, 48, 59 S.Ct. 648, 83 L.Ed. 1092, and as not violative of either the Due Process Clause of the Fifth Amendment, Wickard v. Filburn, at page 129 et seq. of 317 U.S., at page 91 of 63 S.Ct., Mulford v. Smith, page 49 of 307 U.S., at page 652 of 59 S.Ct., Corpstein v. United States, 10 Cir., 262 F.2d 200, certiorari denied 359 U.S. 966, 79 S.Ct. 877, 3 L.Ed. 2d 834, or of the guarantee of religious freedom under the First Amendment, United States v. Kissinger, 3 Cir., 250 F.2d 940, 942-943, certiorari denied 356 U.S. 958, 78 S.Ct. 995, 2 L.Ed.2d 1066, or of the Tenth Amendment's reservation of powers to the states, Shafer v. U. S., 4 Cir., 229 F.2d 124, 129, certiorari denied 351 U.S. 931, 76 S.Ct. 788, 100 L.Ed. 1460. See also Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 70 S.Ct. 403, 94 L.Ed. 381, which concerned the comparable Sugar Act of 1948, 7 U.S.C. § 1100 et seq. And "once the question of constitutional power is answered in the affirmative the wisdom, need and effectiveness of a particular statute enacted in the exercise of that power is a question for the Congress not the courts." United States v. Kissinger, supra, at page 942 of 250 F.2d, Wickard v. Filburn, supra, page 129 of 317 U.S., at page 91 of 63 S.Ct. That an inequitable result is forthcoming does not render the statute unconstitutional. Wickard v. Filburn, supra, at page 130 of 317 U.S., at page 91 of 63 S.Ct.; Shafer v. U. S., supra, at page 129 of 229 F.2d.
 
 
 32
 We feel, then, that this case comes down to two questions: (1) are the administrative interpretations of the statute valid, and (2) have they been properly applied to the plaintiff's situation.
 
 
 33
 It is apparent from a reading of the policy provisions of the Act, and indeed from the mechanical provisions as well, that, as the plaintiff claims, the Act evinces a desire on the part of Congress as a matter of policy to preserve our national farm resources and to encourage soil rebuilding and soil conserving practices such as proper crop-rotation, and the attainment of "parity of income" for the farmer. On the other hand it is equally evident that the Congress has deemed it to be in the best interests of the nation that abnormally excessive surpluses (and abnormally deficient supplies) be prevented. This has been specifically recognized by the Supreme Court when it said in Wickard v. Filburn, at page 115 of 317 U.S., at page 84 of 63 S.Ct., that "the general scheme" of the Act is "to control the volume moving in interstate and foreign commerce in order to avoid surpluses and shortages and the consequent abnormally low or high wheat prices and obstructions to commerce", and in Rodgers v. United States, 332 U.S. 371, 374-375, 68 S.Ct. 5, 7, 92 L.Ed. 3,
 
 
 34
 "In fact, the whole philosophy of the Agricultural Adjustment Act is based on the theory that the public will be benefited, not damaged, if farmers produce and market within these quotas, thereby avoiding the payment of penalties. The framework of the Act itself, both as originally passed and as amended, and the reports of the congressional committees that drafted it, show a prime purpose to limit national and individual farm production and marketing to the quotas allotted, * * *"
 
 
 35
 It is well settled, of course, that administrative construction of an Act is entitled to great weight. Federal Trade Commission v. Mandel Bros., Inc., 359 U.S. 385, 391, 79 S.Ct. 818, 823, 3 L.Ed.2d 893; Federal Housing Administration v. Darlington, Inc., 358 U.S. 84, 79 S.Ct. 141, 145, 3 L.Ed.2d 132; United States v. American Trucking Associations, Inc., 310 U.S. 534, 549, 60 S. Ct. 1059, 1067, 84 L.Ed. 1345. Regulations are to be sustained unless unreasonable and plainly inconsistent with the statute and they are not to be overruled except for weighty reasons. Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S. Ct. 695, 92 L.Ed. 831; Fawcus Machine Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397; Hart-Bartlett-Sturtevant Grain Co. v. Commissioner, 8 Cir., 182 F.2d 153, 158; Halpin v. Collis Company, 8 Cir., 243 F.2d 698, 704. This principle applies to regulations issued under the Act. Gardner v. United States, 5 Cir., 239 F.2d 234, 237; Edwards v. Owens, D.C.E.D.Mo., 137 F. Supp. 63, 65. One claiming that a regulation is invalid has the heavy burden to "make its invalidity so manifest that the court has no choice except to hold that the Secretary has exceeded his authority and employed means that are not at all appropriate to the end specified in the act of Congress." Boske v. Comingore, 177 U.S. 459, 470, 20 S.Ct. 701, 706, 44 L.Ed. 846; Gardner v. U. S., 5 Cir., supra, at page 237 of 239 F.2d; Fulford v. Forman, D.C.N.D.Tex., 144 F.Supp. 536, 540, affirmed, 5 Cir., 245 F.2d 145; Ralph Knight, Inc. v. Mantel, 8 Cir., 135 F.2d 514, 517. Regulations, however, cannot be arbitrary. They must have a basis in the statute and be within the authority granted the administrative agency. Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488; Social Security Board v. Nierotko, 327 U.S. 358, 66 S. Ct. 637, 90 L.Ed. 718; Morrill v. Jones, 106 U.S. 466, 1 S.Ct. 423, 27 L.Ed. 267.
 
 
 36
 After a careful review of the Secretary's regulations directed to the 1959 wheat crop we can conclude only that they embody a reasonable administrative interpretation of the statute, that they are not arbitrary or unreasonable, and that they are valid. One cannot say that these regulations are simple. They are, it seems to us, extraordinarily complex. But so indeed is the statute itself.[5] Complexity, however, is not synonymous with arbitrariness, unreasonableness, or invalidity. We feel that the administrative interpretations applicable here represent in their entirety a reasoned and reasonable administrative effort to implement the statute fairly.
 
 
 37
 Past acreage, of course, is one of the factors taken into consideration; this is specifically mentioned in § 1334(c).[6] There must be some basis of allocation of acreage and the historical factor which takes into consideration each producer's past share of the market, while it may be somewhat offensive to new farms and to lands not devoted to wheat during the base period, is not an arbitrary or unreasonable factor to employ. This, in fact, is implicit in the Supreme Court's holding in Secretary of Agriculture v. Central Roig Refining Co., supra, 338 U.S. 604, 612, 614, 618, 70 S.Ct. 403.
 
 
 38
 The same may be said with respect to the requirement, applied to Reason (v), that there be a substantial change in the acreage planted to wheat from year to year and to the application of the "acreage indicated by cropland" limitation, 7 C.F.R. (1959 Supp.) 728.911(g), to the situation where all years in the base period are eliminated under Reason (iv). Parallel with and paraphrasing what was said in the Roig case at page 614 of 338 U.S., at page 408 of 70 S.Ct., we would have to say here, if we were to hold the applicable administrative interpretations invalid, that the Secretary's judgment must be replaced with our own and that it is not for us to reject the balance he struck "unless we can say that his judgment is not one that a fair-minded tribunal with specialized knowledge could have reached." As the Supreme Court said there, so we conclude: "This we cannot say."
 
 
 39
 This takes us to the second question having to do with the application of the statute and the regulations, which we have found to be valid, to this plaintiff. The Review Committee is the trier of fact. Its findings, if supported by substantial evidence, are conclusive. § 1366. Crolley v. Tatton, 5 Cir., 249 F.2d 908, 911; certiorari denied 356 U.S. 966, 78 S.Ct. 1005, 2 L.Ed.2d 1073. And "substantial evidence" in these cases under the Act does not mean proof beyond a reasonable doubt but only such relevant evidence as a reasonable mind might accept to support a conclusion, Lee v. DeBerry, 219 S.C. 382, 387, 65 S.E.2d 775, 777, or, as the same court has described it, "competent evidence." Lee v. Berry, 219 S.C. 346, 352, 65 S.E.2d 257, 259; Mace v. Berry, 225 S.C. 160, 171, 81 S.E. 2d 276, 280. And "* * * it is not the Court's function to substitute its judgment for that of the Review Committee where the Committee has applied the broad phrases" in the regulations "to a specific state of facts," and there is substantial evidence to support its conclusions. Lee v. DeBerry, supra, at page 780 of 65 S.E.2d; Luke v. Review Committee, D.C.W.D.La., 155 F.Supp. 719, 723.
 
 
 40
 We consider then (a) the rejection of the applicability of Reason (v); (b) the acceptance of Reason (iv); (c) the elimination of 1954, 1955 and 1957 from the base year period and the retention of 1956; and (d) the alleged failure of the County Committee to take into consideration all five factors specified in § 1334(c). We agree with the trial court that Reason (v) is not applicable to the plaintiff's situation and that this is so because his crop rotation system does not involve "a substantial change in the acreage planted to wheat from year to year" but, instead, contemplates a more or less constant wheat acreage characterized by desired devotion of different areas of his farm to wheat in each passing year.
 
 
 41
 To have Reason (iv) apply, it must be shown that the wheat history acreage is "no longer representative because of a change in operations which results in a substantial change in the established crop-rotation system for the farm." Irrespective of the reasons therefor — and they may well have been practical reasons of necessity prompted by overhanging penalties or by the difficulties of transforming his farm operation from row crops to alfalfa — the fact is that plaintiff's acreage in wheat in all the years 1952-1958 inclusive was far less than one-third (or 95) of his 285 tillable acres which he now wants devoted to wheat. That the plaintiff may have had his system of crop rotation in mind or even "in effect" as early as 1950 does not mean, in the light of the acreage facts here, that his operations implementing that scheme did not reflect "a substantial change" within the scope of Reason (iv). His desired rotation system, therefore, factually represents a departure from prior practice equivalent to a substantial change in the theretofore established system from that practiced during the base period. These facts qualify as evidence sufficient to support the committee's finding that Reason (iv) is applicable.
 
 
 42
 We agree also with the conclusions of the County Committee, the Review Committee, and the trial court that the years 1954, 1955 and 1957 might properly be eliminated under Reason (iv). The two committees on the one hand and the district court on the other differed as to the retention of 1956. We agree here with the committees and disagree with the trial court. We do so because it seems to us that it is a permissible and reasonable conclusion to draw that 1956 and 1959 do not present, as between themselves, "a substantial change" in the rotation system.
 
 
 43
 So far as the five factors specified in § 1334(c) are concerned, we feel that the record in substance shows that all have been given consideration by the committees and that this is so despite the County Committee Chairman's statement, on examination by the plaintiff's attorney, that his committee was then considering nothing except crop history. It was brought out through the same witness that some consideration was given to rotation practices, that the committee knew the plaintiff was strictly a wheat and alfalfa farmer; that "we gave what we could, we went as far as we dared to go," that "this farm is higher than most in the county," and that "we couldn't give him any more than what we had given him."
 
 
 44
 We do not overlook the practical result here. The retention of 1956 alone gave plaintiff a greater average base than would have been the case if any other year or years of the base period had been retained, or if all the years had been eliminated under Reason (iv), for then the 15 acre maximum under "acreage indicated by crop land" would apply. One may, therefore, conclude that the committees were perhaps over generous to the plaintiff. The defendant makes no objection to the retention of 1956 with consequent greater average acreage, and we, therefore, do not upset its retention. We regard this as a very different situation than that of Kosdon v. Frick, D.C. S.D.Cal. 148 F.Supp. 218, urged upon us by the plaintiff.
 
 
 45
 We should note that the plaintiff argues that crop-rotation practices and conservation problems can best be adjudicated at the local level, and that if the Secretary's regulations prevent this, they are arbitrary and beyond the proper limits of administrative interpretation. It may well be that problems of this kind may best be handled at the local level. That Congress recognized the desirability, and perhaps the necessity, of local adjudication is evident from the very scheme of the Act with its array of county and review committees comprised of area farmers. But it does not follow that because the regulations have adjustment limitations, the local character of the Act's administration has been nullified and improperly restricted. Indeed, as we have noted, we feel the County and Review Committees have been far more generous with plaintiff's allotment than they might have been, within the ambit of the statute and the regulations, or than this court might have been were it adjudicating the facts.
 
 
 46
 We feel, then, in conclusion, that there was no error in the Review Committee's retention of the year 1956 in the base period and in its consequent calculation of 44.3 acres as the plaintiff's 1959 wheat acreage allotment. That the plaintiff finds himself with a smaller allotment than would be his had he been producing wheat on a more extensive scale in prior years, that he finds himself at a comparative disadvantage, because of the past acreage factor, with certain other farmers of his locality having farms of comparable size, that the restriction is inconvenient and not to his liking, that he is unable to use to its full extent and without possible penalties the crop rotation scheme of his choice but may be required, instead, to utilize a rotation scheme less appealing to him, are natural but not illegal results of regulation imposed by the legislative process to fill a need which Congress has found to exist. As the Supreme Court has said in Wickard v. Filburn, supra, at page 129 of 317 U.S., 63 S.Ct. at page 91:
 
 
 47
 "It is of the essence of regulation that it lays a restraining hand on the self-interest of the regulated and that advantages from the regulation commonly fall to others. The conflicts of economic interest between the regulated and those who advantage by it are wisely left under our system to resolution by the Congress under its more flexible and responsible legislative process. Such conflicts rarely lend themselves to judicial determination. And with the wisdom, workability, or fairness, of the plan of regulation we have nothing to do."
 
 
 48
 and in Secretary of Agriculture v. Roig, supra, at page 619 of 338 U.S., at page 411 of 70 S.Ct.:
 
 
 49
 "The Act may impose hardships here and there; the incidence of hardship may shift in location and intensity. It is not for us to have views on the merits of this legislation."
 
 
 50
 The problems of surplus and of deficits are common to all farmers. Sharing of reductions, though inequities be present, is a basic concept of the Act. The plaintiff, we feel, must live with it and with the regulations which have been promulgated for 1959.
 
 
 51
 Reversed and remanded with instructions to affirm the Review Committee's determination.
 
 
 
 Notes:
 
 
 [1]
 Statutory references are to sections as they appear in U.S.C. and U.S.C.A
 
 
 [2]
 "Abnormally excessive and abnormally deficient supplies of wheat on the country-wide market acutely and directly affect, burden, and obstruct interstate and foreign commerce. * * *
 "It is in the interest of the general welfare that interstate and foreign commerce in wheat and its products be protected from such burdensome surpluses and distressing shortages, and that a supply of wheat be maintained which is adequate to meet domestic consumption and export requirements in years of drought, flood, and other adverse conditions as well as in years of plenty, and that the soil resources of the Nation be not wasted in the production of such burdensome surpluses. * * *
 "The conditions affecting the production and marketing of wheat are such that, without Federal assistance, farmers, individually or in cooperation, cannot effectively prevent the recurrence of such surpluses and shortages and the burdens of interstate and foreign commerce resulting therefrom, maintain normal supplies of wheat, or provide for the orderly marketing thereof in interstate and foreign commerce.
 "The provisions of sections 1331-1339 * * * affording a cooperative plan to wheat producers are necessary in order to minimize recurring surpluses and shortages of wheat in interstate and foreign commerce, to provide for the maintenance of adequate reserve supplies thereof, and to provide for an adequate flow of wheat and its products in interstate and foreign commerce. The provisions hereof for regulation of marketings by producers of wheat whenever an abnormally excessive supply of such commodity exists are necessary in order to maintain an orderly flow of wheat in interstate and foreign commerce under such conditions."
 
 
 [3]
 These committees, which are comprised of three farmers elected by the farmers of the county, are, under § 1388(a), the same local committees utilized in the administration of the Soil Conservation and Domestic Allotment Act of 1935, 49 Stat. 1150 as amended, 16 U.S.C. § 590h (b)
 
 
 [4]
 This section refers only to "farm marketing quota" and not to "farm acreage allotment." Because of the interdependence of these terms and because the parties make no point of the absence of reference to "farm acreage allotment," we, for purposes of this case, regard the statute as authorizing review of acreage by the review committee
 
 
 [5]
 The Fifth Circuit has characterized the parallel cotton provisions of the Act as "a legislative structure * * * abstruse" that "sets forth formula which, to the tutored, reflects the product hammered out in the legislative process, but to the uninitiated, appears to be an unintelligible stream of words. * * *" Fulford v. Forman, supra, at page 149 of 245 F.2d
 
 
 [6]
 The factor of "past acreage of wheat" was not specified in the Act as originally adopted but came into the Act by the 1953 amendment, 67 Stat. 151, Chapter 194